## D'ARCY v. STAPLES & HANFORD CO.

(Circuit Court of Appeals, Sixth Circuit.  May 19, 1908.)

No. 1,739.

1. PATENTS—EFFECT OF PRIOR ADJUDICATION—PERSONS AND MATTERS CONCLUDED.

A decree adjudging the validity and infringement of a patent in a suit defended by the manufacturer of the infringing device, who, although not a party to the record, had complete charge and control of the defense, is conclusive upon him, in a subsequent suit brought against him by the same complainant, as to all matters of fact and law necessarily litigated and determined, which include the validity of the claims involved and infringement by the particular device in suit; but such decree is not conclusive on the question of infringement by other devices which may fairly be differentiated from the one in suit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 622-625.

Operation and effect of decision in equitable suit for infringement, see note to Westinghouse Electric & Mfg. Co. v. Stanley Instrument Co., 68 C. C. A. 541.]

2. JUDGMENT—CONSTRUCTION—REFERENCE TO OPINION.

Where a decree is general in its terms, an opinion filed by the court may be taken into consideration for the purpose of determining definitely what questions were presented and decided.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 30, Judgment, §§ 967-970.]

3. PATENTS—CONSTRUCTION OF CLAIMS—SUBSEQUENT PATENT TO SAME PATENTEE.

A second patent applied for by and granted to a patentee for a device for the same purpose, but different in form from one shown in an earlier patent, may be taken into consideration in construing the earlier patent, as affording a presumption that it did not broadly cover other forms than the one described.

4. SAME—INVENTION.

There is no invention in making two parts of one thing or one part of two, when by such change no different result is attained.

[Ed. Note.—For cases in point see Cent. Dig. vol. 38, Patents, §§ 15-29.]

5. SAME—INFRINGEMENT—SPRING SUPPORTS.

The Staples patent, No. 474,536, for spring supports for chair seats, etc., is not for a pioneer invention, but, in view of the prior art, is limited to the particular structure shown and described.  Claims 1 and 3 held valid and infringed as to one device made by defendant, upon a prior decision binding on the parties, but not infringed by a second device in suit.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

See 148 Fed. 19, 78 C. C. A. 493.

The appellee, who was plaintiff in the court below, filed this bill, complaining of the infringement by the appellant of rights secured by letters patent No. 474,536, issued May 10, 1892, to J. A. Staples, for the invention of an improvement in supports for chair-seat springs, which rights the plaintiff claims to have acquired by assignment from the patentee. Three claims were made in the patent, of which the first and third only are involved in the present controversy. The case came here in 1906, upon an appeal of the defendant from an order granting a preliminary injunction. This court, without expressing any opinion upon the merits, but finding there was no such abuse of the discretion of the court below as would justify any modification

of the order granting the injunction, affirmed it. D'Arcy v. Staples & Hanford Co., 148 Fed. 19. 78 C. C. A. 493. The report erroneously gives the names of the judges of the First Circuit as the judges sitting, instead of naming the judges of the Sixth Circuit, as it should have done. Thereupon further proceedings were taken in the court below, and at the final hearing upon pleadings and proofs a decree was entered sustaining the first and third claims of the patent, and declaring the infringement thereof by certain of the structures made and sold by the defendant, and noninfringement by others which are specified. The defendant has appealed from that decree. The plaintiff has not appealed.

F. L. Chappell, for appellant.
F. P. Warfield, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge, having made the foregoing statement of the nature and history of the case, delivered the opinion of the court.

It is alleged in the bill of complaint that prior to the commencement of this suit the complainant had filed a bill in equity in the Circuit Court of the United States for the District of Massachusetts against one Charles H. Lord, a citizen of that state, charging him with infringement of their said patent by the use and sale of spring supports manufactured and sold to him by D'Arcy, the defendant in the present suit, and that the constructions now complained of "are identical in all essential features with those in controversy in the said suit above mentioned against Charles H. Lord." It is further alleged that the suit was proceeded with and was brought to hearing upon pleadings and proofs; that thereupon the court rendered its opinion, sustaining the validity of the first and third claims of the patent, and finding the infringement thereof by the defendant, Lord; and that the court entered a decree in accordance with its said opinion. The bill then proceeds as follows:

"Your orator further avers that thereafter the said defendant, Charles H. Lord, who was defended in all respects by the defendant herein, Frank P. D'Arcy, who had assumed entire control of the said suit, filed a petition for a rehearing, which said petition, after due consideration thereof by the court, was denied."

The answer of the defendant admits the commencement of the suit in Massachusetts and the prosecution thereof to a final decree as alleged in the bill, and further, admits that one of the structures here in controversy is essentially the same as the one held to be an infringement in the former case, but avers "that the other structures here in controversy are essentially different from the structure there held to be an infringement." The answer makes no response to the allegations of the bill touching the participation of D'Arcy in the defense of the Lord suit.

It is urged by the complainant, now appellee, that D'Arcy, by having taken up the defense of his vendee, Lord, and conducted it as if it were his own, is estopped by the decree. This is the mainstay of the appellee's position in argument on this appeal. If this position depended upon the allegations of the bill, it would be difficult to support it. The bill does not allege, at least with any sufficient certainty, that

D'Arcy was given control of the defense at the beginning, when he could have employed his counsel, shaped the answer, and conducted the examination of the witnesses and the production of other proof, so as to fully exhibit the defendant's case, and, incidentally, his own. But in the course of taking the testimony in this case before the examiner the defendant's counsel made the following admission, which was taken down:

"Defendant admits by his counsel that Frank P. D'Arcy, defendant herein, took charge of the defense in the suit of Staples & Hanford Company v. Charles H. Lord, in the Circuit Court of the United States for the District of Massachusetts, and defrayed the expense thereof, but that said Frank P. D'Arcy made no move to become a party to the said suit, was never asked to become a party by the complainant or any one else, and did nothing more than to protect the interests of said defendant, Charles H. Lord, and hold him harmless as to any decree that might be or was entered against him."

And Lord himself testified:

"That after the bill was filed in that suit he (Lord) had nothing whatever to do with the conduct thereof, but the entire case was turned over to the D'Arcy Spring Company, which is the business name of the defendant D'Arcy, and that said D'Arcy had entire charge of the defense."

Lord's testimony further shows that:

"He did this in view of correspondence between D'Arcy and Lord and D'Arcy and Nelson, Lord's attorney, to the effect that D'Arcy would take charge of the suit against Lord, providing he should have 'complete control of the litigation.'"

The foregoing admission of counsel and the testimony of Lord were put into the case without any objection founded upon the pleadings. The allegations of the bill were defective in this regard. Nevertheless, it is not the case of an entire want of pleading, and there is some show of an attempt to plead that D'Arcy undertook and carried on the defense for Lord. In these circumstances we think it cannot be doubted that he is concluded by the decree in respect to all questions of law or fact which were necessarily litigated and determined in that suit. They are matters finally adjudged as between the parties to the present suit. Lane v. Welds, 99 Fed. 286, 39 C. C. A. 528; Penfield v. Potts & Co., 126 Fed. 475, 480, 61 C. C. A. 371.

We are next to inquire what questions were definitely settled in the former adjudication, and upon which the estoppel rests. The principles by which we are to be guided are clearly stated and defined by numerous decisions of the Supreme Court, from which we might select for a beginning the cases of Cromwell v. Sac County, 94 U. S. 351, 24 L. Ed. 195, and Russel v. Place, 94 U. S. 606, 24 L. Ed. 214. Before referring to these and other cases we should premise that the infringement here complained of is another infringement than that which constituted the cause of action in the Lord Case, and the estoppel is not the same as that which arises where the identical cause of action is sought to be relitigated. The questions to which the estoppel relates are questions which were incident to and involved in the former suit. This distinction is clearly marked in the opinion of the court in Cromwell v. Sac County, supra. It is desirable, also, to state certain facts concerning the former suit, in order to ascertain the application of

the rules of law which govern the subject. The patent was for a support for springs in upholstery, such as chairs, sofas, bed bottoms, and the like. The spring support proposed by the patent, as shown in the drawings, comprised two forms, each consisting of a single wire, of sufficient strength to uphold the springs, and extending from the top of the frame of the chair, etc., on one side, down and under the bottom of the springs, and then up to the top of the frame on the opposite side. Along the nearly horizontal portion of this wire, in the first form shown, horizontal coils were formed of the wire at proper distances apart to receive the straight stem of a wire spring in the form of an inverted cone. This was the adaptation for supporting the spring. Fig. 2 of the patent illustrates this form of support and springs assembled thereon.

2, 2, and 3, 3, is the spring support which is the subject of the patent. b', c', and d' are the stems of the springs going down through the coil of the supporting wire. c' shows underneath a like coil in a cross supporting wire, in cases where a cross-wire is used. The dotted lines below at the right and left hand represent a conformation of the spring support to adapt it to different widths of bed bottoms. In another form of spring support the horizontal part is shown in vertical "corrugations," as they are called; that is, in short, abrupt bends, in which a hook formed of the stem of the spring turned upward, then outward, and then downward, rests. This latter corrugated form of the support is the subject of the second claim of the patent and is not here involved, except as it may aid in interpreting the first and third claims. It may be noted here that this scheme of a spring support contemplates a single wire centrally supporting the spring at its apex, and not two parallel supports for the same spring, though in the second form, where an hour glass form of spring may be used, the outer coils of the spring may be rested in the corrugations of the spring support. In the Lord Case the structure which was held to offend consisted of a wire spring support, otherwise like that of the patent, but at the connection with the spring the wire was bent upward in the form of a loop, and this loop was bent in the form of a hook over the outer coil of an hour glass spring. When the springs and their supports were assembled, these hooks, going over the wires, would hold the springs in their places. But the hooks were not closed over the coils of the springs, and it was therefore easily possible to engage and disengage the entire structure by mere manipulation. So the parts might be shipped to the retailer in packages put up more compactly, in the "knock-down" as it is called, and be by him assembled in the

proper relations for the ultimate purchaser, thus saving considerable expense in the cost of transportation.

After the decree was entered the complainant sought to reopen it and allow it (the complainant) to prove another infringement by the use and sale by defendant of another spring support which did not contain a bend in the wire, but was connected with the springs by independent wire fastenings. The court refused to reopen the case, holding at once that this was not an infringement. In the present case one of the alleged infringing spring supports is identical with that held to infringe in the Lord Case. The pleadings and decree in the Lord Case were general, declaring simply that the defendant had infringed. There is nothing, therefore, in them which indicates with precision what kind of a spring support was held to infringe. But the Circuit Court filed an opinion, and this opinion was adopted as its own by the Circuit Court of Appeals on appeal to that court. 148 Fed. 16, 78 C. C. A. 167. And we think that we may, and should, refer to the opinion to definitely ascertain what questions were presented to the court and decided by the decree. Stearns v. Lawrence, 83 Fed. 738, 28 C. C. A. 66; Corcoran v. Canal Co., 94 U. S. 741, 24 L. Ed. 190; Last Chance Min. Co. v. Tyler Min. Co., 157 U. S. 690, 15 Sup Ct. 733, 39 L. Ed. 859. From that we learn that a certain specific structure was held to infringe, and no other. That structure is identified as being one of the structures alleged to infringe in the present case. Upon these facts we think the court below rightly held that the defendant was precluded by the former decree from denying the validity of the patent, and was also precluded from denying that the use and sale of the particular spring support involved in the adjudication was an infringement of the patent in suit.

But the court below in the present case went on to hold and decree that another form of spring supports used by the defendant was also an infringement, and that certain others were not. And the appellee here contends that this one of the other forms was rightly held to be an infringement by force of the former decree. We say "this one," because it was the only other form which the complainant assailed, and it complains that the others were pressed into the case by the defendant in the shape of structures patented to the defendant by later patents. As the complainant was entitled to dominate the litigation so far as its own case was concerned, we think it might justly complain of any attempt to make an issue of other matters than those which the complainant had put in issue by its proof. It may be, however, that the defendant might introduce his later patents for the benefit of the presumption arising from the grant of them that these additional forms were not regarded in the Patent Office as covered by the former patent to Staples. This might depend upon the question whether they were patents for original inventions, or mere improvements on others. The court below, however, seems to have regarded all the defendant's spring supports as before it for direct adjudication. But the complainant did not appeal. This limits our review to the one which was the subject of the controversy in the Lord Case, and the other form of spring support which the complainant assails as an infringement. And to this latter form we shall now direct our attention.

It is contended by the appellee that the form we now purpose to consider is plainly an equivalent to, if not the same thing as, the spring support which was held to infringe in the former suit. To lay the foundation for this contention it is urged, and we are warned in the brief to observe, that the Staples invention is a pioneer in this art, and dominates all similar forms of spring supports, of which this of defendant's is one, and that the effect of giving this character to the spring support is to broaden the estoppel of the former decree. Prima facie we should hardly expect this claim to be well founded, in view of the fact that, as appears, more than 150 patents have been granted in this country for chair, sofa, and bed bottoms composed of wire springs and various forms of supports. And when we come to examine such of them as are presented by this record, we find that the art was so full of such structures as to utterly preclude the possibility of attributing to the Staples invention the broad character claimed for it. At most, and so much we are bound by the decree in the Lord Case to concede to it, it stands for the particular forms of spring supports which are shown in the description of his invention in the specifications, illustrated by the drawings of the patent. Duff v. Sterling Pump Co., 107 U. S. 636, 639, 2 Sup. Ct. 487, 27 L. Ed. 517. The claims must be restricted to the particular spring support described, as, if construed more broadly, they would be void because anticipated. The court in the Massachusetts case expressed a doubt of the presence of invention, in which we share. With regard to the scope of the estoppel of the former decree, we think it extends no further than to establish that the particular form of spring support which was the subject of the controversy is an infringement of the complainant's patent. It cannot be extended to other forms by inference or argument, as, for instance, that another form should be regarded as an equivalent, for at once the question arises for debate whether it is so. We do not mean to say that the burden of an estoppel may be escaped by pointing to wholly unimportant differences, as of the color of things, minute variations of form, or other characteristics, which nevertheless leave no question of identity. It is axiomatic that an estoppel must be certain, and "it is of the essence of estoppel by judgment that it is certain that the precise fact was determined by the former judgment." De Sollar v. Hanscome, 158 U. S. 216, 221, 15 Sup. Ct. 816, 818, 39 L. Ed. 956. It was not necessary to determine in the former suit whether this form of support was an infringement. In fact, no issue was made upon it or decided.

The defendant's spring support, with which we are now dealing, though not in other respects materially differing from that which was held in the Lord Case to infringe, contains a bend in the wire which connects with the spring, not by an open hook, but by a rigid engagement with a coil of the spring, which prevents freedom of action between them, and also prevents disengagement by mere manipulation, and requires a mechanical change of form before the spring and its support can be disengaged. This might be thought to be a small matter of difference from the form having an open hook in the spring support. But the whole field of the art, as shown by the numerous prior patents, was filled with trifling differences, and the advance

made by the Staples invention was not greater than the difference between this spring support of the defendant and his own. What is apparently a matter of small difference proves to be of much importance in the organization of the springs and their supports. The history of the art, shown to some extent later on, indicates that inventors and manufacturers esteemed it a great advantage to secure the spring at its base in a rigid upright position, for thereby the necessity of cross-wires in the upper part of the spring was obviated either wholly or in large part. When cross-wires are depended upon for staying the springs, they are much subject to derangement and breakage from the strains put upon them in varying directions when in use. So small a difference in Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, as the turning of a link from an upright to a horizontal and partly suspended position was held to give validity to a patent because of the advantage thereby secured. And see a case relating to bed bottoms in Simmons Mfg. Co. v. Southern Spring Bed Co., 140 Fed. 606, 72 C. C. A. 174, decided by the Sixth Circuit Court of Appeals. We have some difficulty in finding how the court reached the conclusion in the Lord Case that a spring support engaging by a hook with a coil of the spring was the equivalent of the device of the Staples patent, and are led to suppose that the progress which had been made in the art at the date of this invention was not so fully disclosed by the evidence in that case as it is by the proof in this. This is not said, however, with any purpose to derogate from the binding force of the judgment there rendered. But, giving due effect to that decision, we do not think it extends to a device which can be differentiated from the spring support held to infringe in that case. Assuming this to be so, we proceed to state our views upon the question whether this other form of spring support which the appellee complains of should be held to be an infringement. As already intimated, we think it clear that the appellee's patent can only be sustained for the particular forms of spring supports therein described, and that the claims must be narrowed accordingly in order to save them.

There was nothing new in a spring support suspended in the frame of chairs, sofas, beds, or other like structures, nor in making it of wire instead of other material, nor in the mode of its attachment to the top of the frame, nor in making bends in the wire for securing and supporting the springs at the properly spaced places, and thereby preventing them from moving laterally on their supports. Staples in his application gave credit to the former art to the extent of saying that it had been common to use crossed bands of webbing nailed to the frame of the seat for the purpose of supporting the springs, and also to use bands of metal secured to the seat frame for the same purpose. These forms of spring supports he gives reasons for discrediting. But he stops there, and thereupon proceeds to describe his own invention as of a spring support made of wire suspended in the frame, having a horizontal portion under the springs and having the ends secured upon the top of the frame by turning the end at a right angle, drawing it to a point, and driving it into the frame, or making an eye at the end of the wire and driving in a nail or screw. To adapt the wire to receive the springs he made coils in it, or corrugated it, as already ex-

plained. In the form covered by claims 1 and 3, here involved, it is obvious that there is nothing to prevent the springs from sagging or tipping over in any direction, for he only has the one wire for a row of springs. Other means must be employed to maintain the upright position of the springs, as by cross-wires or cords, which would have to bear the stress and strain of the use of the bed, sofa, or chair, etc. Perceiving this defect pending his application for the patent, he filed another application for a patent for a spring support in which he used intersecting or crossing corrugated wires meshing at the crossings, so that the upper bends in one should lie in the lower bends of the other. By turning the lower end of an inverted conical spring under the corrugations of one wire and over those in the other, the spring became fixed in a rigid, upright position. He gives in stating his object in making this invention, that in other forms, some having two parallel wires, and some one, the springs were liable to displacement by turning sidewise or rotating upon the supporting wires; and a patent was granted to him on that application. We refer to this patent for two purposes: First, to show that Staples did not then conceive that his other application would cover all forms of spring supports suspended in a frame and having bends in the wire adapted to secure the springs; and, second, because in this he confesses his familiarity with wire supports, both in the forms of a single wire, and of two parallel wires; and, third, because the granting of this patent affords a presumption that the patent in suit did not cover other forms of spring supports having bends in the wire than the one described in this, his former patent. Miller v. Eagle Mfg. Co., 151 U. S. 186, 208, 14 Sup. Ct. 310, 38 L. Ed. 121.

In making a statement of several previous forms of supports for springs in similar structures we shall pass by old forms of band webbing and flat strips of metal attached to the frame and suspended therein, noting merely that in a patent to Ingersoll, granted in 1870 for a chair bottom, there is shown a metallic strip suspended in the frame, having the ends attached to the top of the frame and supporting an inverted cone-shaped spring "centering in and resting at its lower end on the metal strip." This was the only means for supporting the spring in the chair bottom.

A patent granted to Smith in 1882 for a bed bottom shows the spring supports, called "ties," made of wire, attached at each end of the frame, and loops or bends in the wire, called "hooks," at fixed distances apart, and adapted to receive the coil of the spring at the end thereof, and, bending over it, secure it in its place. The patentee says these cross-ties are "crimped to form loops * * * which are made to engage with the springs by passing the loops partly around the upper coils, b, of the springs," and further says that "this system of ties and hooks is used at the top and at the bottom of the bed bottom." The ties form the only support for the springs, and the engagement of the spring support with the coil of the spring holds the spring from slipping upon the wire.

In a patent granted to Purefoy in 1883 two parallel spring supports run under each row of the springs from end to end of the bed bottom. They have vertical loops to receive the lower coil of the

spring, but, instead of being bent over it, are secured thereto by passing a short piece of wire under the loops and over the coil of the spring. These base pieces, says the patentee, "may be made of wood or metal in any suitable form; but it is deemed most advantageous to construct them of wire, and such construction itself forms part of the invention." And he says that his base pieces may be made integral with the springs, a form which the defendant employs by rigidly attaching them together. In this instance the spring supports did not carry the weight of the bed bottoms, as in some earlier structures, but rested upon slats extending underneath.

In figure 3 of a patent issued to Platt in 1884 is shown a bed bottom in which the apex of the spring is straightened out into a stem, precisely as in the figure of the Staples patent above shown. This stem is carried down into a hole in a wooden slat, which is attached at its ends to the frame and forms the spring support. The association of the spring and its support is precisely the same as that shown in the Staples patent in suit, only that the coil in the one provides the hole for the stem of the spring which is provided in the wooden support of the other.

A patent to Heller granted in 1885 shows a similar mode of supporting the springs. The apex of the spring is formed into a stem, and this is driven down into a hole in the spring support, which is here also of wood. Heller reinforced this construction by cross-links or rods tying the springs together at their lower coil, and extending from one side to the other of the frame, thus securing the springs in an upright position. Fig. 3 of this patent shows the ends of these cross-rods bent down and driven into the frame, and, in another figure, secured by a staple on the frame; and he explains how all the parts can be readily folded and compacted for storage or transportation.

In a patent to Mellon of December 1, 1885, the spring supports are of wire, extending from side to side or end to end of the frame, and secured thereto by coiling the ends around the frame. Bends or loops are formed in the wire at the place where the springs are to be set on, and these bends are carried over the lower coil of the spring and secured there by a stem extending laterally from an adjacent spring. The stem passes over the loop and under the coil of the spring. It is obvious that this engagement securely holds the spring from slipping on the wires. It is not liable to displacement in use; but the patentee says that the parts may be readily disengaged by forcing the joint inwardly, so that the stem of the adjacent coil will be withdrawn from the bend in the supporting wire. This is a self-supporting bed bottom, as they are in all of the patents we are noting, except where we specially note that they rest on another support, and hangs upon the frame. The spring support of this patent fills all the requirements of the first and third claims of the Staples patent, except that in the third claim the specific mode of attachment to the frame is by driving down into the frame a bent portion of the end of the wire, and bending the wires out or in to a different angle, and so making them longer or shorter to accommodate the differing widths of beds. There could be no invention in either of these provisions. The mode of attachment to the frame was no problem for even the commonest mechanic, and the

various modes, whether by a nail or screw put through an eye of the rod, which was one of his own forms, or by making the nail on the end of the rod, as in his other form, were old and common equivalents. There is no invention in making two parts of one thing, or one of two, when by such change no different result is attained. Bundy Mfg. Co. v. Detroit Time Reg. Co., 94 Fed. 524, 36 C. C. A. 375; Eames v. Worcester Pol. Institute, 127 Fed. 67, 73, 60 C. C. A. 37; Standard Caster & Wheel Co. v. Caster Socket Co., 113 Fed. 162, 51 C. C. A. 109; General Electric Co. v. Yost Electric Co., 139 Fed. 568, 71 C. C. A. 552; Howard v. Detroit Stove Works, 150 U. S. 164, 170, 14 Sup. Ct. 68, 37 L. Ed. 1039.

This particular form was used in the Platt patent for securing the ends of the cross-rods to the top of the frame. These cross-rods held the upper ends of the springs in place; but they also served in part to carry the weight of the bed and of the user. And the patent to Heller, Fig. 3, shows the ends of the cross-rods "bent to form a point which is driven into the slat." This "slat" is a cleat secured to the inner side of the bed frame or rail. And so of the accommodating the length of the spring supports to the width of the bed. It was a mere question of construction in every bed bottom suspended in the frame, of which there were many. And it would be perfectly obvious that a wire could be made shorter or longer by bending or straightening it.

Another patent to Mellon, No. 331,523, granted December 1, 1885, shows wire spring supports secured to the ends of the frame and having bends in the wire to engage the spring by bending the loop or bend over the lower coil of the spring, which prevented the spring from slipping on the wire and held the spring upright in its place. Like wire spring supports bent to receive the springs were used in two other patents issued to the same patentee on December 8, 1885, respectively.

A patent to Ames in 1886 shows wire "suspension supports upon which the vertical springs are seated." These wire supports are attached at the end to the upper side of the frame of the bed. How they are to be attached is left to the builder's preference among such attachments.

A patent to Huber in 1888 shows a spring support suspended inside the frame. It consists of a metal strip "bent upward at an angle near either end outside the outer springs to form inclined hangers, and at their extreme outer ends outward and downward to form hooks adapted to engage the upper edges of the respective side bars."

A patent to Leggett, granted in 1890, shows spring supports consisting of "stout or thick wires" attached to the frame at their outer ends and having vertical bends in the wire at the seat of the springs, which prevent the springs from moving on their supports. The supporting wires are crossed and engage the lower coil of the spring.

In a patent to Bone in 1890 is shown a wire spring support attached to the frame by a hook at either end and having bends or loops in the wire to engage the lower coil of the spring by being bent down over it and thus "prevent the tie rod (as the spring support is called) from slipping on said coil and hold the spring in its proper position."

A patent to Rose, applied for in July, 1891, and issued December 31,

1891, also shows wire supports attached to the frame and having "vertical shoulders or offsets around which the end coil of the springs are seated and secured."

We have given this somewhat tedious description of some of the former patents to verify the statement that there was no new feature in the first and third claims of the Staples invention, except it be in making a complete coil in the spring support adapted to receive the stem on the apex of the spring. All else was old and common. The patentability of Staples' invention seems to us to rest on fragile grounds, when we come to impose the necessary limitations upon it. The characteristic part of the defendant's spring support, which is supposed to be a reproduction of that of the plaintiff, is found in many specimens of the earlier art, except that the defendant hammers down the bend in the spring support upon the coil of the wire to an extent that it forms a rigid attachment not detachable by mere manipulation.

It is urged that the Staples device has gone into extensive use and has revolutionized the business, and the proof shows that the early forms of spring supports of webbing or flat strips of metal have been discarded. But we are convinced that this is not because of the utility of the limited invention found in the Staples patent, but has come about from the advantages of modern forms of construction, which made use of wire for supports and formed bends in them for locking the foot of the spring upon them, an advantage which could not be attained by the use of webbing, or as well by flat metallic strips.

The decree of the court below will be affirmed, in so far as it declares the first and third claims of the complainant's patent No. 474,-536 to be valid, and in so far as it declares that the making, using, or selling of the spring support, styled therein as "Complainant's Exhibit, Defendant's Model Seat Spring," is an infringement thereof, and also in so far as it awards to complainant damages and profits arising from that infringement, and directs the ascertainment thereof, and enjoins further infringement of that character. The said decree will be reversed in so far as it declares the manufacture, sale, or use of the spring support styled "Defendant's Exhibit No. 7B, Sample of Spring Manufactured by D'Arcy No. 5B," to be an infringement, and awards damages and profits and an injunction thereon. The costs of the appeal will be divided.