## ENTERPRISE MFG. CO. v. WILLIAM SHAKESPEARE, JR., CO.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1915.)

No. 2517.

1. PATENTS ⬅26—"INVENTION"—NEW COMBINATION OF OLD ELEMENTS.

If a new organization of old elements is such that it produces a new mode of operation and a beneficial result, there may be patentable invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ⬅26.

For other definitions, see Words and Phrases, First and Second Series, Invention.

Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

2. PATENTS ⬅328—VALIDITY AND INFRINGEMENT—FISH BAIT OR LURE.

The Rhodes patent, No. 777,488, for a fish bait or lure, *held* not anticipated, valid, and infringed.

3. PATENTS ⬅26—INVENTION.

There is no invention in making two parts of one thing or one part of two, when by such change no different result is obtained.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ⬅26.]

Appeal from the District Court of the United States for the Northern District of Ohio; William L. Day, Judge.

Suit in equity by the William Shakespeare, Jr., Company against the Enterprise Manufacturing Company. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 211 Fed. 477.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

J. B. Fay, of Cleveland, Ohio, and R. H. Parkinson, of Chicago, Ill., for appellant.

O. A. Earl, of Kalamazoo, Mich., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge.  Suit for infringement of United States patent No. 777,488, December 13, 1904, to Rhodes.  The District Court held the patent valid and infringed, and entered the usual decree for interlocutory injunction and accounting.  This appeal is from that decree.

The patent relates to improvements in fish baits or lures.  The stated object of the invention specially pertinent here is "to provide, in a fish bait or lure, an improved means of securing the hooks in position."  Figures 1 and 2 of the patent drawings are reproduced herewith; figure 1 being slightly reduced.

Fig. 1

The specification, following the statement that the improved bait is preferably shaped like a minnow and may be suitably painted or decorated as desired, thus describes in part the construction:

Fig. 2

"Arranged longitudinally through the body portion A, which is secured thereto, is a rod B.  The front end of the rod B is formed into a loop for convenience in attaching the line.  The tail or trailing hook F is secured to the rear end of the rod B.  Transverse openings A' are formed through the body, one for each pair of hooks which it is desired the body shall carry.  These openings are provided with suitable metal socket-rings, as clearly appears in Fig. 2.  A split ring a is provided for each pair of hooks. (See Fig. 2.)  By this means the hooks are detachably secured in position and may be readily changed as desired or in case one should become broken may be readily renewed.  The shanks of the hooks rest on the edges of the holes or sockets, so that the points of the hooks are supported out from the body in position to receive the strike of the fish.  They are also supported so that the body of the minnow is not abraded by the friction of the hook points against the same."

The claims here involved are Nos. 8, 9, and 10, and are printed in the margin.[1]  The defense is that the combinations embraced in the

---

[1] "8. In a bait or lure, the combination of a body having a transverse opening therethrough; a rod arranged transversely through said opening; a split

claims in issue were without novelty and the claims thus invalid; or, at least, that the claims, if valid at all, must, in view of the prior art, be so narrowly construed as to exclude infringement by defendant's structure. We first consider claims 8 and 10.

A bait in the form of a minnow was old in the art; indeed, the claims in issue do not include the form of the bait. It was old to have hooks arranged on opposite sides of a minnow bait; these oppositely arranged sets of hooks were sometimes stapled on, as in complainant's "Kazoo" bait, were sometimes attached to the outer ends of transverse wires running through the body of the minnow, the hooks being attached to loops formed in the ends of the transverse wire, as in defendant's "Trory," "Muskallonge" and "Yellow Jacket" baits; and sometimes attached by screw eyes in metal-lined sockets, as in the "Heddon" minnow. It was also old to use a rod extending longitudinally through the minnow, for attaching a line to the front end and hooks at the rear end, as in defendant's "Trory," "Muskallonge" and "Yellow Jacket" baits. In some cases this central wire passed through a loop in the transverse wires, as in the "Gaide" and "Pflueger" baits. It was also old to use a split ring for attaching the hooks, as in Duke's patent (1899), to the body of the bait, and, in at least two of the Allcock patents, to the rear end of the snood, which passed slidably and longitudinally through the bait.

[1] But nowhere in the prior art do we find the specific combination of the claims in issue; indeed, as will appear, at least one of the elements is not shown in the art previous to Rhodes, and it is familiar learning that if the new organization of old elements is such that it produces a new mode of operation, and a beneficial result, there may be patentable invention. Dowagiac Mfg. Co. v. Superior Drill Co. (C. C. A. 6), 115 Fed. 886, 901, 53 C. C. A. 36. With the exception of baits employing the "Devon" body, the prior art discloses no more plausible approach to the "transverse opening" of the claims here in issue than is found in the perforations which contain transverse hook-supporting wires of the Trory, Muskallonge, Gaide, and Pflueger devices. But these perforations for transverse wires are, we think, in no proper sense the transverse openings of the patent in suit; they are closely filled by the wires, which are practically imbedded, and when so filled no "opening" remains. This "opening" is aptly described in the Gaide patent as a "transverse perforation" intersecting the longitudinal perforation. These openings have no proper relation in either form or function to the permanent metal-socketed transverse openings of the patent in suit, which are not designed to be filled, but in which the element connecting the hooks with the longitudinal rod lies loosely and flexibly.

ring on said rod arranged in said opening; and a pair of oppositely arranged hooks on said ring, for the purpose specified.

"9. In a bait or lure, the combination of a body having a transverse opening therethrough; a rod arranged transversely through said opening; and a hook secured thereto.

"10. In a bait or lure, the combination of a body having a transverse opening therethrough; a rod arranged transversely through said opening; a split ring on said rod arranged in said opening; and a suitable hook on said ring, for the purpose specified."

The nearest approach to Rhodes' "transverse openings" is found in the Allcock and similar devices employing the "Devon" hollow metal "spinning" or "rotating" bait, a familar form of which, minus attachments, is here reproduced.

In two of the Allcock devices for example, which are as close references as any in defendant's favor, the split ring at the rear end of the snood to which the hooks are attached moves slidably in a longitudinal opening extending from the tail end of the bait body nearly to the fins. While a given section of this opening, if such may be imagined, might be said to be transverse to the body of the bait, it is clear that the entire opening is not the transverse opening of the Rhodes patent. This Allcock opening is aptly described in the Millward and Gregory  patent as "two longitudinal slots, one in the upper and the other in the lower side of the said body, the said slots extending from the tail er d to near the vanes or fins of the body." Nor does the split ring of the Allcock devices operate transversely of the opening; it moves only longitudinally therein; and it is at least open to doubt whether the snood of the Allcock device is the equivalent of the longitudinal wire of the Rhodes patent.

[2] The prominently distinguishing elements of the combinations of the claims in question are the transverse opening through the body of the bait, the longitudinal rod disposed transversely through such opening, and the split ring, whereby the hooks are detachably attached to and supported by the longitudinal wire. It satisfactorily appears from the evidence that this method of attaching the hooks gives great flexibility, presents the hooks in position to receive the strike of the fish, and reduces the danger of release of the fish from the hooks and of breaking the latter through contact with the boat. We think the District Judge rightly concluded that the combination permits ready change or renewal of the hooks by removal of the longitudinal rod and its replacement after change made in the hooks. We think the device of the patent produces a new mode of operation and a beneficial result, and that claims 8 and 10 are thus valid.

Claim 9 contains no reference to the method of securing the hook to the longitudinal rod; but if we have correctly concluded that the openings filled by the transverse wires of Gaide and Pflueger and of the Trory, Muskallonge and Yellow Jacket baits, the longitudinal slots of the Devon bait, and the sockets of Heddon, are not the transverse openings of the Rhodes patent, the combination of claim 9 does not impress us as so clearly found in the prior art as to justify declaring the claim invalid as being too broad. The question is not a practical one here; and, for the purposes of this case, we do not feel justified in holding the claim invalid.

*Turning to the question of infringement:* Fred D. Rhodes, the inventor, applied for a patent in November, 1903. His uncle, J. B. Rhodes, who was a practical business man as well as an expert fisherman, was attracted by the device and arranged to take an interest with his nephew in the manufacture. A few samples (just how many does not definitely appear) were manufactured strictly according to

the patent drawings. These had flat (as distinguished from round or shaped) bodies. J. B. Rhodes had charge of a manufacturing exhibit at the St. Louis World's Fair of 1904, and in connection therewith proceeded to manufacture fish lures under the Fred D. Rhodes invention, but discovered that flat bodies were expensive to manufacture, as they could not economically be made by machinery. He accordingly adopted a round or shaped body. It was then seen that such thicker body would be practically cut in two by openings large enough for the split ring, as the thicker the body the larger must be the ring, and the opening must be fully as large as the ring. He accordingly adopted an elongated split link in place of the split ring, and instead of an integral and continuous longitudinal wire running through the body employed a threaded rear rod and a threaded front rod, each screwing into the wooden body, one of them passing through the link connecting with the hooks (and, where there were both front and rear body hooks, as in one form of Rhodes' manufacture during the World's Fair or immediately thereafter, each rod engaging a connecting link). The bait so manufactured was received with favor, and many orders were taken. He was advised by counsel that the changes in the manufacture referred to were not patentable, but were merely modifications of the fastenings of the F. D. Rhodes' patent application, presumably then still pending. The structure as built by J. B. Rhodes in 1904 has ever since been on the market, and has met with great favor. J. B. Rhodes, in October, 1905, sold the patent for a substantial sum to the immediate predecessor of complainant company, who, in July, 1908, assigned it to complainant.

In 1907 or 1908, while complainant or its immediate predecessor were actively manufacturing and marketing the device, the defendant, with knowledge of this fact and of the Rhodes patent, began, and has ever since continued, to manufacture practically an exact copy in all substantial respects of the bait as manufactured by J. B. Rhodes and his successors, including complainant; and its superintendent and vice president applied for and obtained a patent (which was assigned to defendant), one claim of which, as allowed, covered the transverse openings and line-attaching threaded rod screwed into the body of the bait, and the method of connection thereto by means of split links, being the substantial and distinguishing features of complainant's commercial structure. It is conceded that the applicant did not invent the device in question, and the only explanation for the action taken is the suggestion of counsel that the claim, which was introduced by way of amendment by applicant's attorney (not defendant's counsel in this case), is not shown to have been allowed with the applicant's knowledge. The record is silent on this subject. Disclaimer as to the claim in question was filed by defendant in the Patent Office, but not until four years after the patent was allowed, nor until after this appeal was filed in this court.

If complainant's commercial structure is within the Rhodes patent, it is clear that defendant's structure infringes. But defendant insists that the invention of the Rhodes patent was impracticable and discarded, and that the structural changes made by J. B. Rhodes involved a substantial departure from the patent, and so are not covered by the claims in suit. In this connection it is urged that the theory of

the patent involved a nondetachable longitudinal rod and the removal of hooks from the split ring while still in engagement with the rod, and that the removal of the rod and its replacement was impracticable except in a machine shop. We think none of these contentions is sustained by the record. While it is true that the removal of the hooks from the split ring while connected with the rod is a difficult operation (though not impossible, as practically demonstrated on the argument), we find nothing in the patent suggesting that the longitudinal wire was nonremovable or not intended to be removed; on the other hand, J. B. Rhodes testified, without dispute, so far as we have found, that the structure as manufactured by the inventor was "one of the best lures I ever used," and that to change the hooks in the lure he had several times opened the eyes at the front, straightened the rod, pulled it through, so that the ring and hooks could be pulled out at one side of the lure, replaced the broken hook, and inserted the rod in its former position, turning the eye back again with pincers. Although in one of the samples of Fred D. Rhodes' manufacture presented by defendant the eye at the front end of the rod is shown soldered down, J. B. Rhodes testified, again without dispute so far as we have seen, that he never knew of a structure being so manufactured by Rhodes. The record convinces us that while the Rhodes device, as made by the inventor, was much less practical than in form later adopted, it contained the invention of the later commercial structure; in other words, that the changes made by J. B. Rhodes, and later adopted by defendant, are mere matters of "structural variation" contemplated by the language of the specifications—not essential and functional, but only of form. The use of separate front and rear threaded rods was not new in the art. Examples are found both in the Heddon bait and in one form of defendant's Trory minnow. Their use in place of the integral and continuous rod was not invention.

[3] There is no invention in making two parts of one thing or one of two, when by such change no different result is obtained. D'Arcy v. Staples & Hanford Co. (C. C. A. 6), 161 Fed. 733, 742, 88 C. C. A. 606; Edward Hilker Mop Co. v. U. S. Mop Co. (C. C. A. 6), 191 Fed. 613, 617, 112 C. C. A. 176, and cases there cited. The split link in question is substantially only an elongated split ring, and we think the two devices are not different in substance. While Rhodes' contribution to the art may not have entitled him to a very broad range of equivalents, we think the conclusion we have reached involves but a narrow range.

In our judgment, the District Court reached the proper conclusion; and its decree is accordingly affirmed, with costs.