**WABASH CORP. et al. v. ROSS ELECTRIC CORP. et al.**

**No. 21, Docket 21714.**

United States Court of Appeals
Second Circuit.

Argued Oct. 10, 1950.

Decided Feb. 21, 1951.

Chase and Frank, Circuit Judges, dissented in part.

Kenyon & Kenyon, New York City, for plaintiff, Wabash Corporation.

Arthur G. Connolly, Wilmington, Del., (Theodore S. Kenyon, New York City, Arthur G. Connolly, Wilmington, Del. and Edward A. Ruestow, New York City, of counsel), for plaintiff, Hartford National Bank & Trust Co. (Trustee).

Alexander C. Neave, New York City, (Charles H. Walker, Harry R. Pugh, Jr., New York City, Vernet C. Kauffman and James J. Lazna, Cleveland, Ohio, of counsel), for defendants.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The facts in this case have been fully set forth in the opinion of Judge CHASE. I differ with him only in so far as he would hold the product patent valid. Judge Frank and I have been unable to discover any patentable invention in the plaintiffs' product. The Ostermeier, van Liempt and Crowley Patents taught the art enough to defeat the claims of the product patent relied on. In the first, a metallic foil was used; in the second, a metallic wire; and in the third, metallic wool. The only thing that remained was to fill the entire bulb with the wire for, given that, the filling would normally be undulating, serpentine, and elastic. If there was any invention in either of the patents in suit, it was in the mode of blowing the wire into the bulb with a stream of controlled air. The defendants failed to adopt the precise mode called for in the process patent and thus did not literally infringe. But the plaintiffs argue that they, as the first to use air for filling flash bulbs, should be entitled to a broad range of equivalents. Nevertheless, we all agree that these differences between the plaintiffs' process and the defendants' are sufficient to prevent a decree for infringement in what seems to be a narrow field of invention. Accordingly the process patent is held not infringed, and the decree of the District Court dismissing the action as to it is affirmed; the product patent is held void for lack of invention and the decree sustaining it, and holding it infringed, is reversed.

CHASE, Circuit Judge, dissenting in part.

This appeal is from a decree in a suit for the infringement of two patents, one, No. 2,115,423, issued to C. Korver on April 26, 1938, for a "Method and Device for Transporting Wires," and the other, No. 2,162,847, issued to the same patentee for a "Flash Lamp." The first patent is for a process used in the manufacture of the flash lamp which is the product covered by the second patent, and they will hereafter be called respectively the process patent and the product patent. Some of the claims of the process patent were held invalid. Those have all since been disclaimed and are not now involved. Others were held not infringed. All the claims of the product patent were held valid and infringed; an injunction was granted and an accounting ordered. The plaintiffs are the Wabash Corporation, exclusive licensee under both patents, and the Hartford National Bank and Trust Company, which holds the legal title to both patents in trust. They have appealed from so much of the decree as holds the process patent claims not infringed. The defendant Ross Electric Corporation which sells the accused lamps in the Eastern District and the defendant General Electric Company, which manufactures and distributes those lamps for sale, have appealed from that part of the decree which holds the product patent valid and infringed.

The flash lamps are the kind known as photo-flash lamps. The development of such lamps began with a type made by the General Electric Company under the Ostermeier patent, No. 1,776,637, about twenty years ago, and has marked a decided advance in the art of flash photography. Before then, the necessary intense light of short duration was provided by igniting fast-burning powders in open containers, creating smoke that was more or less disagreeable to the senses and somewhat of an interference with taking a succession of pictures. Ostermeier did away with all that by providing a glass bulb filled with oxygen and aluminum foil in such a way that an electric current, entering the bulb, would ignite the filling. An intense light of sufficiently controlled duration but with a sharp peak, i. e., a comparatively short period of highest intensity, could be obtained from his lamp. Yet his great advance over what had been done before left much to be desired. The shortness of the period of maximum light output made synchronization with the camera shutter difficult, his bulbs had to be so large that a photographer could readily carry but a few at once and they had to be handled with much care to prevent breaking. Their manufacture was made slow and costly by the necessity of filling the bulbs with the right amount of the right size of foil by hand, by pushing it in with a rubber-tipped rod such as a pencil with its eraser, to insure its uniform distribution in a crumpled condition throughout the bulb. Still this lamp was such an improvement over the old open flash method that it was in great demand and in 1938 nearly 4,000,000 were sold.

In 1936 the predecessor of Wabash Corporation, having obtained an exclusive license under the patents in suit, began making the patented lamps. They were so much cheaper to make, so much more efficient in operation, and in other respects so much better than the Ostermeier lamps that the latter were superseded in a few years. In 1942 over 17,000,000 of the pat-ented lamps were sold and in 1948, over 60,000,000. In 1942 General Electric began to make and to market the accused lamps, and their sale has nearly equalled that of the patented ones. Though some of this marked commercial success may be justly attributable to factors independent of the disclosures of either of the patents in suit, it is apparent that those disclosures were in large measure responsible for it.

## The Process Patent

While the process patent originally covered more, the elimination of the claims as above noted narrowed it to a method usable only in filling containers shaped in general like the bulbs of photo-flash lamps. Claims 2, 5 and 6 were held valid. Claim 2 is typical and reads as follows: "A method of uniformly filling a hollow body closed except for a single aperture, with an internally-strained wire of small mechanical strength, comprising the steps of carrying the wire through the aperture and into the hollow by a stream of gas leaving through another portion of the aperture, and distributing the wire in a curled condition and as uniformly as possible within the hollow by the recurrent flow of the gas therein."

I will confine my description of the process to one, as disclosed by the specifications, which is usable for filling photo-flash lamps, since the accused process is of that kind and the patentee called his "particularly well adapted" for that.

Whenever a metal wire[1] is bent the stretching which occurs on the outer side of the bend and the compression on the inner side so distort the metal that internal strains are set up. These strains have a tendency to make the wire curl when it is not under tension, the amount of curling varying directly with the intensity of such strains. Most metal wires of small absolute strength are inherently so strained that they have some tendency to wave or curl when loose, and winding on a spool serves to increase this tendency. Korver sought to fill a photo-flash bulb with such

1. The wire filler of a photo-flash bulb must, of course, be made of metal which will burn as desired, like aluminum or an alloy of it and magnesium.

wire mechanically so that it would be evenly distributed throughout the bulb and would be so curled and waved that it would be held in place during handling and use by its resiliency against the walls of the bulb and between curls throughout its own mass. He did that by assembling a machine which first unwound from a spool the fragile wire when it was to be used for filling. If it was not already sufficiently internally strained to curl as desired in the bulb, the wire was pulled over a sharp edge to impart such strains. Then it was carried to, and through, a guide tube of small diameter which extended into the aperture of the bulb which was of much greater diameter; there the guide tube was greatly enlarged in diameter but still kept much smaller than the neck of the aperture. A supply of compressed air was fed into the guide tube near the end where the wire entered, this being done in such a way that the air would flow toward the bulb. This air stream carried the fragile wire along the small part of the guide tube under sufficient tension to keep it from curling or kinking during that transit but when this stream reached the enlarged or "belled" portion of the guide tube, within the neck of the bulb, the air expanded and was thus slowed in speed enough to let the wire curl. From there the air stream, slowing even more after it entered the larger portion of the bulb to be filled, distributed curled wires throughout the receptacle by flowing to and against the closed end of the bulb and then reversing and passing out of the bulb through the aperture between its inner sides and the outside of the guide tube. This reversal of the direction of the air flow and its passage to, and out of, the aperture of the bulb is what is designated in Claim 2 as "the recurrent flow of the gas" which distributes "the wire in a curled condition and as uniformly as possible within the limited space."

In the accused process the material from which the filler is made is not at the beginning a fragile wire wound on a spool. It is, instead, a roll of aluminum foil of the desired thickness and width. It usually is about eight inches wide and .001 of an inch thick. This sheet of foil is unwound from its roll by feed rolls between which it passes. These feed rolls first draw it through a lubricating tank, where it is treated to make it shear more readily, and then push it over a shear plate. There a rotary cutter, synchronized in speed with the rate of travel of the sheet of foil, slices off narrow strips of a pre-determined width.[2] Suitably placed below these rotary shears is the flared-out end of a small hollow tube. This tube leads to a filling head with which it makes an air-tight connection. The filling head has an outside rim into which a photo-flash bulb may be placed so as to make an air-tight connection between the filling head rim and the outside of the bulb at some part of it between the neck and the point of the maximum diameter of the bulb. The inside of the filling head forms an extension of the carrier tube and has its outlet near the center of the bulb to be filled. Above the bottom of the carrier tube there is an opening in the side of the filling head which has an air-tight connection with a trap which is in turn connected to an exhaust pump. This pump tends to create a vacuum at the intake end of the carrier or feed tube into which there is a rush of the air which surrounds the shreds as they are cut off. As the trial judge justifiably found, "The shreds are sucked into the feed tube at such high velocity that the naked eye cannot see their condition as they are drawn into and through the nozzle. However, they are probably drawn into the feed tube in 'hairpin' form, and are carried by the stream of gas through the filling tube and are kept fairly straight until they reach the bulb of the lamp. There the successive shreds strike the bulb wall and intertangle with one another to form a tangled, skeletonized mass of curled, crinkled or rumpled material within the bulb. The bulb is then removed from the filling tube and placed over an air jet which serves to fluff the material and to distribute it uniformly through the bulb." The judge

2. Usually .001 of an inch, the same as the thickness of the foil, so that the strip is roughly square in cross section.

also found on adequately supporting evidence that, "Unlike Korver, the General Electric filling method does not deal with or produce a wire which has been internally-strained so as to assume a curled or coiled condition when released." And that, "The General Electric filling method does not uniformly distribute the shreds as called for in the Korver patent. A separate fluffing operation with a jet of compressed air * * * is necessary to obtain uniformity in the General Electric operation."

These differences between the two processes were considered by the trial judge sufficient to preclude infringement, and I agree. Though they may appear to be but narrow distinctions I think that in the light of the prior art they are crucial.

But before taking up that phase of the matter I wish to notice that the decision below apparently followed the "better practice" as pointed out in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644, by dealing with the validity of the claims before deciding the question of infringement. The three claims remaining after those held invalid had been disclaimed were what I might call tentatively held to be valid and then held not infringed. That entirely disposed of the suit on that patent and the decree as to it provided for the dismissal of the complaint without adjudging the three remaining claims to be valid. Thus there was an investigation and determination as to validity to comply with the above mentioned better practice, which the record affirmatively disclosed, without the error of adjudging any claims valid which, even if valid, would not have been infringed. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263. See Cover v. Schwartz, 2 Cir., 133 F.2d 541, 545; Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 152 F.2d 79, 81. Without such a record on appeal, there is no way for an appellate court to know, in patent cases where the complaint has been dismissed solely for failure to prove infringement, what has been done, if anything, to determine whether the patent should be held invalid in whole or in part. Unless in such cases the record shows that, or can be required to show it, the approved practice, except in the comparatively rare instances where the patent in suit is obviously invalid, will be what the trial judges choose to make it and perhaps that is what the Supreme Court means to let it be. But if appellate courts are to have any effective supervision of the better practice, records on appeal must provide the basis for that. This record does so and accords with what seems to be needed for such supervision. Of course in those comparatively rare cases where the patent in suit is clearly invalid, and a trial court has failed so to hold, an appellate court may do so without any remand for findings for, by hypothesis, the record is already adeqaute to support such a decision.

But, where invalidity was a substantial issue, and the complaint was dismissed for non-infringement without findings on the question of validity in compliance with Rule 52(a), Fed. Rules Civ. Proc. 28 U.S.C.A., on appeal the judgment has been vacated and the cause remanded for such findings. Helbush v. Finkle, 9 Cir., 170 F.2d 41. I take that to mean that where the course followed below is not taken, in cases where validity presents a substantial question, it may be required in order that invalid claims be not left as a threat longer than necessary. But I do not understand that, on appeal by a plaintiff from a judgment dismissing a complaint solely on the ground of non-infringement, an appellate court need necessarily review the trial court's conclusion, not carried into the judgment, that the claims are valid, before it can, in the absence of error as to the infringement issue, affirm the judgment. It has long been the practice to treat non-infringement and invalidity as sufficient and alternative grounds for dismissing the complaint in a patent infringement suit. See Coulter v. Eagle & Phenix Mills, 5 Cir., 35 F.2d 268, certiorari denied, 281 U.S. 758, 50 S.Ct. 409, 74 L.Ed. 1167. Cf. Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450. Lest a disagreement within the court as presently constituted

create unnecessary confusion, two of its judges think that what was recently said by L. Hand, C. J., in Harries v. Air King Products Co., 2 Cir., 183 F.2d 158, 161, 162, 163 should be emphasized by repetition:

"Since, as will appear, the defendant has not infringed the claims, limited as they must be, the question arises whether we are compelled to review Judge Galston's conclusion in favor of their validity. In what cases a court may dispose of a patent infringement action upon the issue of non-infringement, recent decisions leave in some doubt, we must own. In Electrical Fittings Corp. v. Thomas & Betts Co., 2 Cir., 100 F.2d 403, we held that, after deciding that a defendant did not infringe a claim, we need not pass upon a finding of the district court that it was valid. This we held because the finding had not been necessary to the judgment and for that reason would not be an estoppel, and would not therefore prejudice the defendant. The Supreme Court did not differ with us in thinking that the finding was immaterial, but nevertheless it directed us to strike it from the decree.[3] The rationale of that decision was that the defendant was entitled to have it out because, although it was not an estoppel, it might create some presumptive prejudice against him. It is to be noted that the court did not suggest that we were bound to review the finding, for that would have been inconsistent with its mere deletion. The case is therefore clearly a holding that it is not in all cases necessary to decide the issue of validity. In Cover v. Schwartz, 2 Cir., 133 F.2d 541, the district court had held that the claim was neither valid, nor infringed, and we dismissed the appeal because the patentee did not question the holding of non-infringement. We said that the unchallenged holding that the defendant had not infringed made the case moot and ended our jurisdiction. That decision the Supreme Court cited with approval in Altvater v. Freeman,[4] saying that 'to hold a patent valid if it is not infringed is to decide a hypothetical case,' relying on Electrical Fittings Co. v. Thomas & Betts, supra.[5] Unless there is some difference between a finding of invalidity and a finding of validity, Cover v. Schwartz should have ended with a direction to strike out the holding of invalidity, and perhaps the reason why we did not do so was that a counterclaim remained to be tried.

"So the law stood when Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644, was decided. There the district court had held that the patent was invalid and not infringed, and we had held it valid and infringed. This the Supreme Court reversed, holding the patent invalid, but not passing on the issue of infringement, which have of course become moot upon the finding of invalidity. However, it went out of its way to say, 325 U.S. at page 330, 65 S.Ct. at page 1145: 'There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent'; then, after citing Cover v. Schwartz with apparent approval, it added: 'the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent.' One court has read this as a direction always to decide the issue of validity[6] and perhaps it meant to go so far. However, if it did, it is hard to see how that was in accord with Electrical Fittings Co. v. Thomas & Betts, supra,[7] with Altvater v. Freeman, supra,[8] or with Cover v. Schwartz, supra,[9] which proceed upon the implied premise that the issue of infringement may be disposed of before that of

3. 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

4. 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450.

5. 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

6. Pennington Engineering Co. v. Spicer Mfg. Co., 6 Cir., 165 F.2d 59, 61.

7. 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

8. 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450.

9. 2 Cir., 133 F.2d 541.

validity, since it is only in that event that the issue of the validity can become 'hypothetical,' or 'moot.' The passage we have just quoted from Sinclair & Carroll Co. v. Interchemical Corp., supra,[10] was certainly not put in the form of a peremptory direction, but rather of a cautionary admonition, to be followed when that is the more convenient course; and it is thus that Woodbury, J., construed it in Grant Paper Box Co. v. Russell Box Co.[11] We are disposed so to understand it in the case at bar.

"There are good reasons for allowing some latitude of choice. A decision resting upon non-infringement is generally much more secure than one on invalidity, at least when the question is whether there is a patentable invention. That issue is as fugitive, inpalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts. It involves, or it should involve, as complete a reconstruction of the art that preceded it as is possible. The test of invention is the orginality of the discovery, and discovery depends upon the mental act of conceiving the new combination for substantially every invention is only a combination. Nothing is more illusory, as nothing is more common, than to assume that this can be measured objectively by the magnitude of the physical readjustments required. Courts never tire, or at least in earlier times they never did, of expatiating upon the freshness of insight which observes a little, but fruitful, change which had theretofore escaped detection by those engaged in the field. When all is said, we are called upon imaginatively to project this act of discovery against a hypostatized average practitioner, acquainted with all that has been published and all that has been publicly sold. If there be an issue more troublesome, or more apt for litigation than this, we are not aware of it. The defence for always deciding it first, is that, if the claim be invalid, it should not be allowed to stand as a 'scarecrow'; and that is quite true,

granted the premise. Indeed, the same notion lies back of the disclaimer statute. But it must not be forgotten that the decision of a single court, whether district, or court of appeals, does not settle the question. It is the usual, if not universal, custom of practitioners if the stake is enough, not to rest content with a single decision of invalidity, but to seek another forum, as indeed the disclaimer statute permits.[12] A declaration of invalidity may therefore prove an ignis fatuus, as fictitious a security to those who wish to infringe the claim, as a declaration of validity may be a fictitious menace. We hold that it is open to a court to proceed as is most convenient, subject to the exception that, though the defendant has not infringed, claims may be so evidently invalid that the court should so declare."

The differences to which I have already referred as crucial on the question of infringement are those operations which were claimed as a part of the patented method, viz., the steps of carrying "an internally strained wire" into a "hollow body" and there depositing it "in a curled condition and as uniformly as possible within the hollow by the recurrent flow of the gas therein." I have designated them as crucial because a brief reference to the prior art will show that those steps are what Korver disclosed which was new if anything was. That it was already old to use a contained stream of gas to fill a holder with light material in strands is shown by the Schur patent, No. 1,915,451, which used compressed air to fill a receptacle with weak fiber strands carried into it by the air flowing within a tube. But this is as much as Korver might have learned from Schur, since the latter wanted the filler to be arranged within his container for easy withdrawal, and it had no internal strains, either inherent or imparted to it, to make it curl in the container and become a tangled mass held in place by its own elasticity against the walls. Nor was there what Korver calls his recurrent flow of

10. 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

11. 1 Cir., 151 F.2d 886, 890.

12. Triplett v. Lowell, 297 U.S. 638, 56 S. Ct. 645, 80 L.Ed. 949.

584

gas. No other prior patent narrows the Korver claims more than Schur, and none, therefore, need be mentioned to demonstrate that unless the accused process does those things which distinguish the Korver process there is no infringement. That question depends, as always, upon whether, when the claims are interpreted so as to cover what is patentably new in the light of the specifications and of the prior art, the accused method does substantially the same thing in substantially the same way. Similarity, or even identity, of result will not alone suffice. Swan Carburetor Co. v. Chrysler Corporation, 6 Cir., 130 F.2d 393. Due regard must be had for what is known as the doctrine of equivalents to the end that minor omissions or minor changes will not serve to exonerate one who actually copies, and thus does appropriate, the gist of a patent. Cf. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Royal Typewriter Co. v. Remington-Rand, Inc., 2 Cir., 168 F.2d 691. But when, as here, the accused process does not embrace those steps which distinguish the patented one from the prior art it does not infringe. Dixie-Vortex Co. v. Paper Container Mfg. Co., 7 Cir., 130 F.2d 569, 579, certiorari denied, 317 U.S. 686, 63 S.Ct. 260, 87 L.Ed. 550; Moto-Mower Co. v. E. C. Stearns & Co., 2 Cir., 126 F.2d 854.

### The Product Patent

The patent, No. 2,162,847, for a "Flash Lamp" was granted to C. Korver June 20, 1939. His original application was embraced in that of the process patent already considered and was filed April 26, 1935. This application was divided from that on July 16, 1936, and it is conceded that the date to be accorded his invention is May 18, 1934, when an application for the same invention was filed in Germany.[13]

What this flash lamp is, what it does, and how it does it has already been largely though not entirely, told in dealing with the process patent. The better a photoflash lamp is, the more nearly will it supply the right amount of actinic light at the right time for the camera with which the picture is taken to operate at its maximum efficiency. If the actinic light is produced in synchronism with the shutter movement of the camera, allowing the peak light to affect the film, the best results will follow. But as is so often true, the problem is more easily stated than solved. I shall confine what I now say to the production of actinic light in a closed container like the patented and accused lamps in suit. They produce it by burning a metal—aluminum alone or alloyed with some other substance such as magnesium—in oxygen under greater than normal atmospheric pressure. When combustion starts, the intensity of the light increases rapidly to its peak and then decreases to extinction. The speed with which the peak is attained increases, within limits not here important, as the metal burned is made finer (just as a fire of small pieces of wood will flash into flame more quickly than like wood in larger pieces) and it is more nearly uniformly distributed throughout the container, so that all portions of the metal are surrounded by nearly equal amounts of oxygen. This construction results in a comparatively even rate of combustion, thereby giving a longer maximum output of actinic light. For photographing rapidly moving subjects, the camera shutter should, preferably, be open within this period of maximum output for the time required to sensitize the film and it is obvious that the longer the peak of the flash the easier it is to have the shutter opened within some part of that period. If the duration of the peak and the shutter time were equal the synchronization would have to be perfect for best results but if, for instance, the peak duration substantially exceeds the required shutter time there is a comparatively large tolerance for errors in synchronization, because during the peak any time the shutter opened and closed would do as well as any other. Furthermore, when flash lamps are, like these, ignited by electrically generated heat in contact with the metal, the contact time, i. e., the time in which a given amount of electricity will create heat sufficient for ignition, is shortened by using finer filling.

13. R.S. § 4887, 35 U.S.C.A. § 32.

Thus lamps constructed in accordance with the product patent have characteristics which give them decided advantages.

As the trial court found from ample evidence: "The lamps manufactured by Wabash embodying the Korver patented product are cheaper, smaller, more uniform and more efficient than any photo-flash lamps previously made. They have a light curve which differs from that of the foil lamp in having a lower, broader peak, more like a plateau, so that the difficult problem of synchronization with the camera shutter is largely avoided."

The only lamp which, before the patented lamp, was commercially successful was the foil filled one of Ostermeier, which the Korver lamp pushed off the market. That lamp has already been described, and with its crumpled thin foil, is no anticipation. The foil filler did not burn as readily as the wire one and this comparative inefficiency retarded its production of usable actinic light. Van Liempt's Patent No. 2,037,101 teaches some of the advantages of using wire in place of foil as a filler, but his wire was not uniformly distributed throughout the bulb nor held elastically in place within it. Instead it was wound into a clew and was supported by, or from, the stem which bore the igniter, rather than by the walls. He was primarily concerned with a wire made from aluminum and magnesium in the proportions disclosed. Crowley, in two British patents, Nos. 403,427 and 403,638, mentions metallic wool, among other filling materials, as suitable for a flash lamp, but he comes no closer to showing the Korver lamp. Leijdens filed an application on March 15, 1935, which was the same as his application filed in Germany on March 26, 1934, for a flash lamp and was granted a patent, No. 2,091,601, on August 31, 1937. While it is doubtful whether it is prior art, assuming, without deciding, that it is, the application discloses nothing which anticipates. Leijdens described and patented a device for igniting the filler by means of a "spontaneous reaction" which dispensed with the use of electricity and the consequent need for an electrical supply source. His drawings, which are alone relied on, show bulbs filled with undulating wire in a random course and in a more or less tangled, perhaps curled, condition. Although the wire seems at spots to touch the walls, the contact is not enough to provide appreciable support. Moreover, any doubt as to what does support his filler there might otherwise remain is resolved by the description of a typical drawing, Fig. 1, in the specifications as follows: "Within the bulb and supported by the stem 50 is a combustible material 4 shown as a clew of drawn magnesium or magnesium alloy wire." Thus it appears that the support for the filler is the *stem*, not the walls, and that the filler is a *clew* of wire, quite unlike the Korver filler. Nothing else in the prior art has been called to our attention which is sufficiently near anticipation to require discussion.

Korver was the first to create a flash lamp with a filler uniformly distributed and held in place within the bulb so that the output of actinic light was more easily co-ordinated with the camera and more useful for photographic purposes. His lamp was cheaper to manufacture and less fragile than previous bulbs and it drove them off the market. It is true that the enormous commercial success of the lamp may justly be attributed in considerable part to other factors, like a safe increase in the oxygen pressure which allowed a decrease in the size of the bulbs without a lessening in the actinic light available for use. But I need make no attempt to apportion the cause of its success for that is the make-weight which may tip the scales when the fact of invention is otherwise in doubt. Cf. Jungerson v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L. Ed. 235; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 74. I think that it has here been otherwise proved.

Of the three claims of the patent, all of which were held valid, No. 2 is typical and reads: "2. A flash-lamp comprising a container of actinic light-transmitting material having an active portion, a mass of thin undulated wire disposed within said active portion so as to be elastically supported

from the wall thereof, and a gas which upon ignition enters into an actinic reaction with said wire, said wire being arranged in a serpentine course so as to be in substantially uniform spacial distribution."

It was shown that when the defendant's Ostermeier flash lamp was unable to meet successfully the competition of the patented lamp, the defendant cast about for something that would, and eventually turned up the accused lamps which, being able to do so, have been sold over the succeeding years in about the same quantity as the patented ones. These lamps have already been sufficiently described. It is argued that they do not infringe because the filler is shredded aluminum foil instead of "wire"; because the filler is not "undulated"; and because it is not kept in place in the bulb by its own pressure elastically on the walls.

There is evidence to the effect that the word "wire" is often used to denote a drawn filament. That of course means a round wire, something which the accused filler is not. But there is other evidence which well shows that the term wire is understood to embrace much more than that and to include materials not the result of any drawing operation but of other operations, including shearing, and that "square wire" and that of other shapes is known. That the claims used "wire" in this broad sense to denote material usable as the filler rather than to denote any particular manner of making such filler seems plain enough when it is remembered that nothing was required of it after it was in place in the bulb but to remain there and to burn when ignited. The evidence shows that the accused filler is made of shreds which, though not continuous, are each longer than the diameter of the bulb in which used so that no piece can remain straight for its full length when in position. These pieces are there deformed, intertwined and enmeshed with each other as the result of the force exerted by the process which puts them there. And they so press upon each other and upon the wall of the bulb that they retain the nearly uniform distribution imparted by the fluffing operation having enough inherent elasticity to do so. Indeed there was substantial evidence to support the following finding of the trial court. "The accused photoflash lamps are characterized by the undulating and serpentine course of the shredded material which forms a tangled mass of crumpled shreds bent in every conceivable direction at non-uniform intervals. The individual shreds are fine, fragile wires. The wire filling material of the accused lamps is substantially identical with that described in the Korver patents, even though it is in the form of 8-inch shreds rather than continuous. The mass of shreds is so light (generally less than a tenth of a gram) that the loops and tips in contact with the glass wall of the bulb are adequate to support the filling elastically and hold it in place, just as taught in the Korver patents. In every particular referred to in the claims, the structure of the accused lamps is the same as or the substantially equivalent of that described and claimed in the Korver product patent."

What the defendant has done is but to substitute for the continuous wire of Korver a practically perfect equivalent—shreds sufficiently long to accomplish substantially what Korver's wire accomplishes and in substantially the same way. The interchangeability of these two substances or "wires," once Korver's disclosures were made available to those skilled in the art, was seemingly obvious. The doctrine of equivalents, long recognized in patent law and lately given effect in *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra,* does not permit such close copying of the patented device as was here done.

I am unable to agree with my brothers that the product patent is invalid and would affirm the judgment in respect to both patents.

FRANK, Circuit Judge concurring in part and dissenting in part.

I agree with Judge A. N. HAND with respect to the product patent. I agree with Judge CHASE'S discussion of the process patent, except in one particular: I disagree with much (not all) that he says

in a passage in his opinion which I quote in the footnote.[1] My disagreement concerns the following:

The trial judge made formal findings[2] that three claims of the process patent were valid but not infringed; his decree dismissed the complaint as to these claims. Judge CHASE says that it was proper for the trial judge thus to state his conclusion that the claims were valid, although he held them uninfringed. I agree that, because of the nature of these patent claims, in this case, on the evidence in this record, we may, without reviewing and reversing the finding of validity, exercise discretion to affirm on the ground of non-infringement alone. But I think that the ruling of the Supreme Court in Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263—which reversed this court—obliges us to order that the finding of validity be expunged.

1. "But before taking up that phase of the matter I wish to notice that the decision below apparently followed the 'better practice' as pointed out in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644, by dealing with the validity of the claims before deciding the question of infringement. The three claims remaining after those held invalid had been disclaimed were what I might call tentatively held to be valid and then held not infringed. That entirely disposed of the suit on that patent and the decree as to it provided for the dismissal of the complaint without adjudging the three remaining claims to be valid. Thus there was an investigation and determination as to validity to comply with the above mentioned better practice, which the record affirmatively disclosed, without the error of adjudging any claims valid which, even if valid, would not have been infringed. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263. See Cover v. Schwartz, 2 Cir., 133 F.2d 541, 545; Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 152 F.2d 79, 81. Without such a record on appeal, there is no way for an appellate court to know, in patent cases where the complaint has been dismissed solely for failure to prove infringement, what has been done, if anything, to determine whether the patent should be held invalid in whole or in part. Unless in such cases the record shows that, or can be required to show it, the approved practice, except in the comparatively rare instances where the patent in suit is obviously invalid, will be what the trial judges choose to make it and perhaps that is what the Supreme Court means to let it be. But if appellate courts are to have any effective supervision of the better practice, records on appeal must provide the basis for that. This record does so and accords with what seems to be needed for such supervision. Of course in those compara-

tively rare instances, where the patent in suit is clearly invalid, and a trial court has failed to so hold, an appellate court may do so without any remand for findings for, by hypothesis, the record is already adequate to support such a decision. But, where invalidity was a substantial issue, and the complaint was dismissed for non-infringement without findings on the question of validity in compliance with Rule 52(a), F.R.C.P., on appeal the judgment has been vacated and the cause remanded for such findings. Helbush v. Finkle, 9 Cir., 170 F.2d 41. I take that to mean that where the course followed below is not taken, in cases where validity presents a substantial question, it may be required in order that invalid claims be not left as a threat longer than necessary. But I do not understand that, on appeal by a plaintiff from a judgment dismissing a complaint solely on the ground of non-infringement, an appellate court need necessarily review the trial court's conclusion, not carried into the judgment, that the claims are valid, before it can, in the absence of error as to the infringement issue, affirm the judgment. It has long been the practice to treat non-infringement and invalidity as sufficient and alternative grounds for dismissing the complaint in a patent infringement suit. See Coulter v. Eagle & Phenix Mills, 5 Cir., 35 F.2d 268, certiorari denied, 281 U.S. 758, 50 S.Ct. 409, 74 L.Ed. 1167. Cf. Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450."

2. They read:
"1. Claims 1, 3, 4 and 10 of Korver patent No. 2,115,423, the filling device patent, are invalid over the prior art; claims 2, 5 and 6 are valid.
"2. None of claims 2, 5 and 6 of Korver patent No. 2,115,423 is infringed by the General Electric filling method and device." .
These findings are labelled "Conclusions of Law," but that label is immaterial. See point 2 of this opinion, infra.

As I understand Judge CHASE, he believes that the trial judge here properly coupled the findings of validity and non-infringement, and that Electrical Fittings is here inapplicable, for three reasons:

(a) In this case (says Judge CHASE), unlike Electrical Fittings, the finding of validity was not incorporated in the judgment or decree.

(b) In Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644, decided after Electrical Fittings, the Supreme Court (says Judge CHASE) has laid it down as the "better practice" that the trial judge should inquire fully into the validity of a patent before dismissing the suit for non-infringement only. Therefore, says Judge CHASE, the upper courts must see to it that the trial courts comply with this "better practice"; in order that an upper court may do so, the trial judge should explore the patent's validity, and, if he considers the patent valid, should so find, even if he finds and decides that it has not been infringed (provided only he does not include his validity-finding in his decree). Thus, according to Judge CHASE, the Interchemical case virtually obliterates Electrical Fittings.

(c) Because of Rule 52(a), except in cases where invalidity is grossly obvious, an upper court, says Judge CHASE, must not pass on the issue of validity without first obtaining the trial judge's finding on that issue. Therefore, it was proper for the trial judge here to make a finding of validity (not incorporated in his judgment or decree) although he found the patent uninfringed, for otherwise on this appeal we could not not have dealt with the patent's invalidity if, in our discretion, we had though it desirable to do so. Thus, according to Judge CHASE, Rule 52(a) leaves little if anything of Electrical Fittings.

I disagree with all three of these propositions. To make my position clear, I shall first sketch the background of the Supreme Court rulings in the Electrical Fittings and Interchemical cases.

It is, of course, elementary that, to win a patent infringement suit, the patent-owner must show both (1) that the patent is valid and (2) that the defendant has infringed. A decision against the owner can, then, rest on either or both of the alternative grounds, i. e., (1) invalidity and/or (2) no infringement. Until fairly recently, the courts often preferred to decide against a patent for non-infringement alone. The following two common judicial practices allowed the patent-owner to turn an adverse decision to his own advantage: (a) A court would dismiss for non-infringement without discussing the issue of validity, and so avoid striking down what the evidence showed to be an obviously spurious patent. (b) A court, deciding that a patent was not infringed, would nevertheless gratuitously declare it valid. Each of those practices the Supreme Court has recently denounced.[3]

Judge CHASE, as I understand him, takes the position that it is often proper—indeed necessary—for the trial judge, in order to demonstrate that he has avoided the first prohibited practice, to engage in the second prohibited practice, i. e., often the trial judge may properly state judicially that a non-infringed patent is valid, if only he does not formally put that statement in his judgment or decree. To show why I believe that position mistaken, it will help to describe those two practices more in detail.

(a) *The First Practice.* Of this practice, it was said that it "tends to postpone the determination of the validity of dubious patents where any issue of infringement is offered upon which the case can be decided

3. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450. See also Cover v. Schwartz, 2 Cir., 133 F.2d 541; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 292 (concurring opinion).

in favor of the defendant."[4] As a result, many a patent was left intact when even a casual study of the prior art, as disclosed by the evidence,[5] showed it to be spurious—a "zombi"[6] or a "scarecrow."[7] Such a decision, although adverse to the patent owner, enabled him to say that the court had thought well of his patent. For he could tell infringing competitors: "The judge decided only that the defendant hadn't infringed. He must have thought it valid, for if he had thought it invalid, surely he would have said so." So a well-heeled patentee could use the decision, although it went against him, to threaten other less well-heeled competitors with the notorious expense of patent litigation, and thereby coerce them into onerous license agreements, the cost of which would be passed on to the consuming public.

For these reasons the Supreme Court, as I read its decision in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644, has recently held (per Mr. Justice Jackson) that, where the evidence shows a patent to be a "scarecrow," the court should declare it invalid, whether or not it also finds infringement.[8] This ruling is in the public interest which, as the Supreme Court has also said (per Mr. Justice Jackson) is "so frequently present but so seldom adequately represented in patent litigation."[9]

(b) *The Second Practice.* This second practice—that of judicially declaring a non-infringed patent to be valid, and thus affirmatively endorsing its validity—gave the patent-owner a far more effective coercive weapon than mere judicial silence about his patent's validity. The evils of such judicial benedictions were by no means confined to cases where the evidence plainly revealed that the patents were "scarecrows."

For a finding that a patent is valid, when it is held uninfringed, involves three vices: (1) It is a decision of a hypothetical case, and, as such, is improper, and perhaps unconstitutional.[10] (2) It may, in future litigation, unfairly prejudice the successful defendant.[11] (3) It gives the patent-owner, gratuitously, a highly persuasive precedent for use in litigation, or threatened litigation, with other prospective defendants, thereby hurting the public interest.[12] Consequently, in Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263, the Supreme Court de-

4. Woodward, A Reconsideration of the Patent System, 55 Harv.Law Rev. 950, 957 (1942).

5. That the evidence may often not disclose the prior art which would so reveal, see infra.

6. Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 299, (concurring opinion); Cover v. Schwartz, 2 Cir., 133 F. 2d 541.

7. Bresnick v. U. S. Vitamin Corp., 2 Cir., 139 F.2d 239, 242.

8. Cf. Harries v. Air King Products Co., 2 Cir., 183 F.2d 158 at 163: "Though the defendant has not infringed, claims may be so evidently invalid that the court should so declare."

9. Muncie Gear Co. v. Outboard Co., 315 U.S. 759, 768, 62 S.Ct. 865, 870, 86 L. Ed. 1171.
   This is not novel doctrine. See Pope Mfg. Co. v. Gormully, 1892, 144 U.S. 224, 234, 12 S.Ct. 632, 636, 36 L.Ed. 414: "It is as important to the public that competition should not be repressed by worthless patents, as that the patentee

of a really valuable invention should be protected in his monopoly. * * *" See also Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Slawson v. Grand Street R. Co., 107 U.S. 649, 652, 2 S.Ct. 663, 27 L.Ed. 576; Brown v. Piper, 91 U.S. 37, 44, 23 L.Ed. 200. See further notes 28 and 48 infra.

10. "To hold a patent valid if it is not infringed is to decide a hypothetical case." Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 89 L.Ed. 1450, citing Cover v. Schwartz, 2 Cir., 133 F.2d 541. Cf. Linde Air Products Co. v. Morse Dry Dock & Repair Co., 2 Cir., 246 F. 834, 837.

11. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

12. For recent cases wherein trial judges have relied heavily on earlier decisions that a patent is valid, see, e.g., Steele v. Esquire Laundry & Dry Cleaners, Inc., D.C.W.D.Mo., 90 F.Supp. 61, 63; Hughes Tool Co. v. Chicago Pneumatic Tool Co, D.C.W.D.Okl., 90 F.Supp. 845, 847. See also discussion in Aero Spark Plug Co. v.

cided that, when a trial court makes a finding that an uninfringed patent is valid, the upper court must order that finding expunged.

The evils of both the condemned practices stem from these facts: (a) The Patent Office, because of its setup, frequently overlooks important parts of the prior art in granting a patent. For as Kenyon, a leading patent lawyer, has recently said, the conditions in the Patent Office are such that "it is hardly to be wondered at that a certain number of applications go to issue notwithstanding the existence, undiscovered by the examiner, of some prior patent or publication which seriously impugns novelty."[13]   (b) A trial court has no expert aids of its own choosing to examine into the full details of the prior art and bring them to the court's attention.[14]   (c) The trial court must therefore rely on the litigants to adduce such matter. If a patent-owner sues a defendant who can easily prove that he is not infringing, that defendant ordinarily will not be diligent in digging up, and presenting to the trial court, the adverse prior art data inimical to the patent's validity.[15]   Accordingly, the trial judge, receiving data relative to validity chiefly from the patent-owner,[16] is likely to believe that the patent is valid. He may, therefore, when deciding that the patent is not infringed, either remain silent about validity or pronounce the patent valid.

He is particularly likely to declare a

B. G. Corp., 2 Cir., 130 F.2d 290, 292, (concurring opinion) and in Cover v. Schwartz, 2 Cir., 133 F.2d 541.

13. Kenyon wrote: "Patents are obtained ex parte. An examiner makes the best search he can in the time available to him for examining each of the many cases for which he is responsible. It is greatly to the credit of the Patent Office, and to the chiefs of its sixty-nine patent examining divisions, that in so large a proportion of the cases coming before them they do a surprisingly good job. But no action upon a patent application is any better than the search which lies behind it. As the arts today multiply and expand, searching becomes ever more difficult and slow. Searching, by and large, is the responsibility of the junior examiner, of whom hundreds have newly come to work in the Patent Office since the war. The junior is faced with a classification system in which existing United States patents are arranged by subject-matter in some 43,000 subclasses. As his experience grows he makes up his own further unofficial subclasses in the areas of his responsibility. But only United States patents are included in the general classification system—technical journals and foreign patents, though equally applicable on the issue of patentability, are not classified for him. He must in some way keep abreast of the expanding literature and the large numbers of incoming copies of foreign patents, often poorly indexed or not indexed at all, to keep his own private classes up-to-date. On top of this he is necessarily driven by the volume of work pressing upon him, and has a reputation to make with his superiors for efficiency and despatch of business. Under these circumstances it is hardly to be wondered at that a certain number of applications go to issue notwithstanding the existence, undiscovered by the examiner, of some prior patent or publication which seriously impugns novelty." Kenyon, Patent Law, 35 Am. Bar Ass'n J. (1949) 480, 482.

See also Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290 at 294 note 5 (concurring opinion).

14. See Judge Learned Hand in Parke-Davis & Co. v. H. K. Mulford Co., C.C., 189 F. 95, 115. See also Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 639–640.

15. See Cridlebaugh v. Rudolph, 3 Cir., 131 F.2d 795, 800, as to the reluctance of some alleged infringers to contest validity. See also Armstrong Cork Co. v. United Cork Companies, 3 Cir., 107 F.2d 36, referring to the "esprit de patentability." Cf. Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 299 (concurring opinion), Smith v. Hall, 301 U.S. 216, 218, 57 S.Ct. 711, 81 L.Ed. 1049.

Doubtless, most patent lawyers do not use such strategems. But that, with some patent-owners, no holds are barred, see Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238, 64 S.Ct. 1281, 88 L.Ed. 1596; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514.

16. Of course, sometimes the patent is clearly invalid on its face. Sometimes, too, this appears from the data offered by the alleged infringer in his proof that he has not infringed.

non-infringed patent valid when, from the evidence before him, the patent is not obviously invalid (*i. e.,* a "zombi" or "scarecrow") but one whose invalidity would appear only from a comprehensive presentation in evidence of the prior art. Neatly illustrative of the way in which defective presentation of prior art data may induce a mistaken judicial belief concerning validity are Smith v. Snow, 1935, 294 U.S. 1, 55 S. Ct. 279, 79 L.Ed. 721 and Smith v. Hall, 1937, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049. In the Snow case, the Court sustained a patent's validity. Two years later, in the Hall case, where the defendant produced evidence not offered in the Snow case, the Court held the same patent invalid.

It follows that, as I have said, the evils of the second practice—interdicted by Electrical Fittings—are not confined to cases of patents whose invalidity, as shown by the evidence, is glaringly obvious. Indeed, the patent in Electrical Fittings was not such a "scarecrow." Nor, on the evidence in this record, is any of the three claims of the process patent in the present case.

If, then, the Interchemical case did not, *sub silentio,* over-rule or very substantially modify the Electrical Fittings case, the ruling in Electrical Fittings was violated in the present case, unless Judge CHASE is correct in asserting that Electrical Fittings applies only when the judgment or decree expressly mentions the finding of validity. I shall try to show, infra, that Interchemical did not over-rule or modify Electrical Fittings, and that it is entirely immaterial that the judgment here did not incorporate or mention the finding.

Before proceeding to a more detailed discussion of Judge CHASE'S position, if may be helpful to ′state the judicial practices which, as I understand them, the authorities require, where the court decides for the alleged infringer in a patent infringement suit:

(1) A court in its discretion (where the evidence warrants) may hold that a patent is invalid, or that the accused device does not infringe, or both.

(2) A court must always consider whether the evidence shows the patent to be a "scarecrow."

(3) If so, it must always so hold, whether or not infringement has been shown; as to this, the court has no discretion.

(4) To evidence its compliance with (2), a court may properly state (a) that it has examined the question sufficiently to conclude that, on the evidence, the patent is not glaringly invalid, but (b) that, by so saying, it is not finding the patent valid.

(5) If, however, the court finds no infringement, it should never state that the patent is valid—in its decree, or in its formal findings, or in its "Conclusions of Law," or in its opinion.

(6) Unless the evidence shows that the patent is a "scarecrow," an upper court, in its discretion, may review, and decide the case, on (a) the issue of validity or (b) the issue of infringement or (c) both.

(7) If the trial judge dismisses the suit for non-infringement but states of record that the patent is valid, the upper court, if on the evidence the patent is not a "scarecrow," and if the upper court affirms solely on the ground of non-infringement, must order that the trial judge's statement of validity be deleted—either on motion of the alleged infringer or *sua sponte.* As to such deletion, there is no discretion.

(8) When the trial judge decides that the patent is valid and infringed, the upper court, if it decides that there has been no infringement, and if on the evidence the patent is not a "scarecrow," must similarly order that the trial judge's finding of validity be stricken, although the upper court, in its discretion, chooses not to review the validity issue on the merits.

With this preface, I shall now consider and attempt to answer Judge CHASE's three arguments.

1. *Judge CHASE'S first argument*: i. e., *since the finding of validity here is not incorporated in the decree, the Electrical Fittings case does not apply.*

In the Electrical Fittings case, the Supreme Court reversed this court for refusing to order the elimination of the very

kind of trial court finding we have here: i. e., a finding of validity accompanying a finding of non-infringement. Judge CHASE, as I understand him, says or implies that, since the validity-finding in Electrical Fittings was formally incorporated in the decree, as it is not here, that decision is here inapposite.[17] That this is a distinction minus a difference appears, I think, from a study of Electrical Fittings.

There the trial judge held a patent not infringed; he dismissed the complaint but stated in his decree that the patent was valid. Although the decree was in their favor, the defendants appealed, asking this court to order stricken the portion of the decree which found the patent valid. This court, 100 F.2d 403, 404 dismissed the appeal as "moot," on the ground that the statement as to validity in the decree would not be *res judicata* and so could not harm the defendants who had won the suit. The decree, we said, "merely established that there was no equity in the bill which entitled the plaintiffs to any relief whatever regardless of whether claim 1 was valid or not. That left the losing plaintiffs in no better position in respect to the patent than they were at the time they brought the suit and the successful defendants in no worse." The Supreme Court reversed this court, stating, 307 U.S. at 242, 59 S.Ct. at 860, 83 L.Ed. 1263, that the portion of the decree which held that patent valid should be deleted because, "though the adjudication was immaterial to the disposition of the cause, it stands as an adjudication of one of the issues litigated. We think the petitioners were entitled to have this portion of the decree eliminated, and that the Circuit Court of Appeals had jurisdiction * * * to entertain the appeal, not for the purpose of passing on the merits, but to direct the reformation of the decree."[18]

There is but this one difference between that case and this: here the finding of validity was not inserted or mentioned in the decree. I think it clear that such inclusion of the finding in the decree could not have been any part of the reason for the Electrical Fittings decision, because the harmful adjudicative effect of the finding (which caused the Supreme Court to reverse us) would have been no whit less if the decree had been silent about the finding.

For the cases are legion that, in determining the scope of a decree in later litigation, for purposes of *res judicata* or estoppel by judgment, a court will look to the entire record, including the opinion and findings which were not incorporated or mentioned in the judgment or decree.[19] Under F.R.C.P. 52(a) and 54(a),[20] findings are not a part of the decree. But the Note of the Advisory Committee on Rule 52(a) says: "Findings of fact aid in the process of judgment and in defining for future cases the precise limitations of the issues and the determination thereon. Thus they * * * are an important factor in the proper application of *res judicata* and estoppel by judgment." And the Supreme

---

17. Judge Chase says that here the trial judge "tentatively held" the claims "to be valid"; that this conclusion was "not carried into the judgment"; and that the trial judge dismissed the complaint "without adjudging the three * * * claims to be valid."

18. Cf. Minneapolis-Honeywell Co. v. Thermoco, Inc., 2 Cir., 116 F.2d 845, 847.

19. See, e.g., State of Oklahoma v. State of Texas, 256 U.S. 70, 88, 41 S.Ct. 420, 65 L.Ed. 831; National Foundry etc. v. Oconto Water Supply Co., 183 U.S. 216, 234, 22 S.Ct. 111, 46 L.Ed. 157; Moore v. Harjo, 10 Cir., 144 F.2d 318, 321; Great Northern Ry. Co. v. General Railway Signal Co., 8 Cir., 57 F.2d 457, 461; Fagin v. Quinn, 5 Cir., 24 F.2d 42, 44;

National Brake & Electric Co. v. Christensen, 7 Cir., 278 F. 490, 497; Imperial Machine & Foundry Corp. v. American Mach. Co., D.C.S.D.N.Y., 276 F. 436, 440; D'Arcy v. Staples & Hanford Co., 6 Cir., 161 F. 733, 737; Edelman v. Edelman, 65 Wyo. 271, 199 P.2d 840, 843, 203 P.2d 952; Dietz v. City of Neenah, 91 Wis. 422, 64 N.W. 299, 65 N.W. 500; Gilchrist v. Stevenson, 7 How.Prac., N.Y., 273, 274. See also Nordbye, "Improvements in Statements of Fact and Conclusions of Law, 1 F.R.D. 25, 26–27.

20. The Notes of the Advisory Committee on F.R.C.P. say that those Rules are the equivalent of former Equity Rules 70½ and 71, 28 U.S.C.A. Appendix, which were applicable when the trial judge made his validity finding in Electrical Fittings.

Court has said that Rule 52(a) merely embodies the former equity practice.[21] It follows that the vice of the validity-finding in Electrical Fittings was not its inclusion or mention in the decree.

As I said previously, a finding of validity of an uninfringed patent is harmful, not merely because of its prejudicial effect in future litigation between the same parties,[22] but also because, even when actually founded on an inadequate presentation of the prior art,[23] it may be highly persuasive, if the patent owner sues, or threatens to sue, other alleged infringers,[24] thus helping him to exact ultimate tribute from the public, via patent licenses, without ever facing a thoroughgoing scrutiny of his patent's validity. Under the authorities cited above, courts, in using a case as a precedent, look to the findings therein, regardless of whether or not those findings were separated from the judgment or decree.[25]

Moreover, in the light of those authorities, the validity finding here is just as much a forbidden decision of a hypothetical case as was the finding in Electrical Fittings. It is of marked interest in this connection that, in that case, the Supreme Court, in explaining why it entertained an appeal for the strictly limited purpose of ordering elimination of that finding, cited cases to the effect that such an appeal is legitimate when a lower court exceeds its jurisdiction.[26] In Electrical Fittings, the trial court exceeded its jurisdiction in but a single respect—by deciding (in the finding of validity) a hypothetical case. See Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450; Cover v. Schwartz, 2 Cir., 133 F.2d 541.

In Electrical Fittings, the Supreme Court differentiated (a) an upper court review and reversal on the merits of a finding that an uninfringed patent is valid from (b) an upper court order directing the deletion of that finding. This court recognized that distinction in Harries v. Air King Products Co., 2 Cir., 183 F.2d 158, 161, saying of Electrical Fittings: "It is to be noted that the court did not suggest that we were bound to review the finding, for that would have been inconsistent with its mere deletion."

In the Harries case, the portion of the opinion (quoted by Judge CHASE) which discussed the trial judge's finding of the validity of a patent he found uninfringed, addressed itself at length to this question: Must an upper court, on affirming a trial court decision as to non-infringement, review the validity-finding when, on the evidence, the patent is not a "scarecrow"? This court (I think correctly) answered No.

In that discussion, however, nothing was said of the obligation of an upper court to enter a deletion order, a la Electrical Fittings. Yet since this court did not there enter such an order, it might be argued that the Harries case is a precedent in this Circuit against the position I am here maintaining. I think not. I have carefully read

21. U. S. v. U. S. Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746.

22. In Harries v. Air King Products Co., 2 Cir., 183 F.2d 158, 161, we said of Electrical Fittings: "The rationale of that decision was that the defendant was entitled to have it [the validity finding] out because, although it was not an estoppel, it might create some presumptive prejudice against him."

23. See discussion supra of Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721, and Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049.

24. See, e.g., Imperial Mach. & Foundry Corp. v. American Machine Co., D.C.S.D.N.Y., 276 F. 436 and cases cited in note 12, supra.

25. For this practice in patent cases, see e.g., Steele v. Esquire Laundry & Dry Cleaners, D.C.W.D.Mo., 90 F.Supp. 61, 63; Hughes Tool Co. v. Chicago Pneumatic Tool Co., D.C.W.D.Okl., 90 F. Supp. 845, 847; Imperial Mach. & Foundry Corp. v. American Mach. Co., D.C.S.D.N.Y., 276 F. 436, 437–440.

26. The Court cited Gully v. Interstate Natural Gas Co., 292 U.S. 16, 54 S.Ct. 565, 78 L.Ed. 1088; Oklahoma Gas & Electric Co. v. Oklahoma Packing Co., 292 U.S. 386, 54 S.Ct. 732, 78 L.Ed. 1318; William Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S.Ct. 804, 83 L.Ed. 1189.

the briefs filed in Harries and have discovered that the parties there did not suggest a deletion order; and, while the opinion differentiates between review and deletion, its whole thrust is directed at the lack of necessity for review of such a finding; nowhere does the opinion suggest that deletion is not required by Electrical Fittings. Very likely it was because appellee did not suggest deletion that this court overlooked the necessity for a deletion order. Such an inadvertent omission does not create a precedent. As Mr. Justice Sutherland said: "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." [27]

True, the briefs in the instant case do not suggest an order eliminating the trial judge's finding of validity. But since here a member of the court has called attention to it, I think this court should, of its own motion, act in compliance with the Electrical Fittings ruling, because the public interest is concerned. For the Supreme Court has often warned that the courts should not be mere passive umpires in patent litigation but should act on their own initiative to protect the public interest in such litigation. [28]

Judge CHASE describes as "tentative" the validity-finding here. I see nothing

"tentative" about it. The trial judge labelled it—as he also did his statement that the claims were not infringed—a "Conclusion of Law." But, whether it be a pure finding of fact or a mixed finding and legal conclusion, [29] the failure to label it correctly is but an immaterial mistake in nomenclature. [30]

2. *Judge CHASE'S second argument, i. e., that the Interchemical case compels a reversion to the practice forbidden in Electrical Fittings.*

In the Interchemical case, the Supreme Court said, 325 U.S. 327 at 330, 65 S.Ct. 1143, at 1145, 89 L.Ed. 1644: "There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of noninfringement without going into the question of validity of the patent. Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290; Franklin v. Masonite Corp., 2 Cir., 132 F.2d 800. It has come to be recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz, 2 Cir., 133 F. 2d 541, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent."

Judge CHASE, as I understand him, argues thus: This Supreme Court ruling in

**27.** Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411; KYOS, Inc. v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183; U. S. v. Mitchell, 271 U.S. 9, 14, 46 S.Ct. 418, 70 L.Ed. 799. See also Tefft, Weller & Co. v. Munsuri, 222 U.S. 114, 119–120, 32 S.Ct. 67, 56 L.Ed. 118; St. Louis V. & T. H. R. v. Terre Haute R. Co., 145 U.S. 393, 403–404, 12 S.Ct. 953, 36 L.Ed. 748; U. S. v. More, 3 Cranch 159, 172, 2 L.Ed. 397; The Edward, 1 Wheat. 261, 275–276, 4 L.Ed. 86.

**28.** See, e.g., Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Muncie Gear Co. v. Outboard Co., 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171; Hazel-Atlas Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 670, 64 S.Ct. 268, 88

L.Ed. 376; Brown v. Piper, 91 U.S. 37, 44, 23 L.Ed. 200; Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, 783; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 515; Cridlebaugh v. Rudolph, 3 Cir., 131 F.2d 795, 800.

**29.** U. S. v. Esnault-Pelterie, 299 U.S. 201, 205, 57 S.Ct. 159, 81 L.Ed. 123; Graver Mfg. Co. v. Linde Co., 336 U.S. 271, 275, 69 S.Ct. 535, 93 L.Ed. 672; Graver Mfg. Co. v. Linde Co., 339 U.S. 605, 609, 611, 70 S.Ct. 854, 94 L.Ed. 1097; Great A. & P. Tea Co. v. Supermarket Co., 340 U. S. 147, 153–154, 71 S.Ct. 127; Minnesota Mining & Mfg. Co. v. Coe, 75 U.S.App. D.C. 131, 125 F.2d 198, 199; Refrigeration Engineering Inc. v. York Corp., 9 Cir., 168 F.2d 896, 900.

**30.** Refrigeration Engineering, Inc. v. York Corp., 9 Cir., 168 F.2d 896, 900.

Interchemical means that as to every sort of patent—"scarecrow" or otherwise—the trial judge, even if he finds the patent uninfringed, must always inquire into validity. In order to supervise effectively the discharge of this duty by the trial judge, it is necessary that the upper court know whether the trial judge has conducted that inquiry. Therefore, even when the trial judge dismisses for non-infringement, still, if he considers the patent valid, he must so find.

I think this argument—which treats Interchemical as virtually gutting Electrical Fittings—misinterprets the Interchemical ruling. I believe that the Supreme Court in Interchemical meant simply this: If the evidence shows a patent to be glaringly invalid (i. e., a "scarecrow"), the trial judge must hold it invalid, whether or not he finds it uninfringed. Nothing in Interchemical requires him to hold it invalid, when he finds it uninfringed, unless the evidence does disclose that it is a "scarecrow."[31] And certainly nothing in Interchemical requires or permits him, in defiance of Electrical Fittings, to find that an uninfringed patent is valid.

Judge CHASE, however, impliedly poses this problem: A trial judge dismisses for non-infringement alone. How can the upper court ascertain that he has, pursuant to Interchemical, considered whether, on the evidence, the patent is a "zombi" or "scarecrow"? The answer is that the trial judge need do no more, at most, than to state, in his opinion, something like this: "I have found the patent claims uninfringed and shall dismiss the suit on that ground. I have sufficiently explored the issue of validity to be satisfied that, on the evidence in this record, the patent claims are not glaringly invalid. But this, of course, does not mean that I find them valid." In that way, the judge will satisfy Interchemical without running foul of Electrical Fittings.

Since such a report by the trial judge suffices to meet what Judge CHASE regards as the requirement of Interchemical, the only effect of Judge CHASE'S ruling is to have the trial judge, by violating Electrical Fittings, supply additional information which serves no useful purpose. Consider the instant case: What good is it to this court to know that the trial judge has concluded that the uninfringed claims are valid? Why uselessly extend the Interchemical ruling so that it does the harms which Electrical Fittings outlawed? One recalls the jocular saying: "Papa bring the hammer, there's a fly on baby's head."

As the Supreme Court in the Interchemical opinion does not mention Electrical Fittings, it could not have intended to overrule or eviscerate it. More important, the cases cited with approval and disapproval in Interchemical disclose that the "better practice" there endorsed included a rejection of the practice forbidden in Electrical Fittings:

(a) In Interchemical, the one case cited with approval and as indicative of the "better practice" is our decision in Cover v. Schwartz, 2 Cir., 133 F.2d 541. It is, then, important to note the distinction we there made between (a) finding a non-infringed patent invalid and (b) finding a non-infringed patent valid. We there said 133 F.2d at 545: "The court, in deciding against a patentee-plaintiff, may, with propriety, hold (1) that his patent is invalid, or (2) that the defendant has not committed acts of infringement, or (3) that not only is the patent invalid but also that the defendant has not infringed; there is no requirement that the court must first pass on the issue of infringement and, if it de-

31. That the Interchemical ruling was confined to patents shown by the evidence to be "scarecrows," see the decision of this court in Addressograph-Multigraph Corp. v. Cooper, 2 Cir., 156 F.2d 483, 485.

It has been suggested, however, that an obviously invalid patent is no threat, and that therefore the Supreme Court, in the Interchemical case, could not have intended to limit its admonition to such patents. This suggestion ignores a well-known fact to which I have already adverted: A patent, no matter how obvious its invalidity (or "scarecrow" character) may be to a court, is often used by the patent-owner to coerce an alleged infringer who has not the financial means to engage in the very considerable expense of defending an infringement suit.

cides that there is no infringement, must refuse to decide that the patent is invalid. Indeed, since the public is affected, there is much to be said for a decision in such a case as to the invalidity of the alleged patent monopoly (either alone or in conjunction with a decision of non-infringement) whenever the issue of invalidity is before the court and the evidence warrants such a decision. For a decision as to invalidity will tend to discourage suits against others based on that patent, and mere threats of patent suits, due to the expense of defending such litigation, may often prevent lawful competition which will be in the public interest; the desirability of a decision as to invalidity is especially important because it is the general rule that the government cannot bring suit to have a patent declared invalid, except for fraud inducing its issuance (and perhaps in other unusual circumstances which need no discussion here).

*"Where, however, the court finds against the plaintiff as to infringement, it cannot go on to hold in his favor as to validity. For, once the issue of infringement is decided against the patentee, there exists no case or controversy justifying a decision in his favor that the patent is valid."*[32]

The basis of this distinction (as explained in Cover v. Schwartz) is this:[33] (1) Non-infringement and invalidity are both grounds for a decision against a patent, and therefore either or both of those grounds may properly be used to justify such a decision; just as in many other contexts, a court may assign one or both of two alternative reasons for a decision.

(Only if the evidence shows that the patent is glaringly invalid, must the decision be based on invalidity, whether or not it also rests on noninfringement.) (2) But if a decision against a patent is grounded on non-infringement, its validity, of course, furnishes no alternative grounds for the decision dismissing the action; a finding of validity in such a case is a determination of a superfluous and non-justiciable issue, as well as undesirable from the viewpoint of the public interest.

(b) I think that my interpretation of the Interchemical opinion is further borne out by a consideration of the cases cited with disapprobation in that opinion. The first of those cases is Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951. There the Eighth Circuit said that the trial judge, who had held the patent not infringed, "properly deemed that no necessity existed, for going further and passing on the validity of appellant's patent, and he therefore refrained from doing so, and thereby he followed the usual, *better, and wiser practice*, and thus left the legal status of the appellant's patent as he had found it, clothed with the presumption of validity arising from the fact of the grant."[34] This practice was again endorsed in S. S. Kresge Co. v. Davies, 8 Cir., 112 F.2d 708, 711 where, on the record, the patent was a "scarecrow." Another decision case cited with disapproval by the Supreme Court in Interchemical was that of this court in Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 292. There, on appeal from a decree holding a "scarecrow" patent both invalid and not infringed, this court af-

---

32. On rehearing we said 133 F.2d at page 550, 551 that an upper court "may affirm a judgment adverse to a patentee either by holding (a) that the patent is invalid, or (b) that there is no past or threatened infringement, or (c) that the patent is invalid and also that there is no infringement. The affirmance of a judgment against a patentee, or the reversal of a judgment in favor of a patentee, may properly be based upon a conclusion as to either one or both of the two major elements—validity and infringement—involved in a patent suit; although, as we have said, it may often be desirable to rest a decision adverse to a patentee on invalidity, when the evidence so warrants,

a court is not obliged to do so. The exercise of such a 'discretion' as to the grounds of decision in patent suits—when a real controversy is before the court—gives rise to no novelties or complexities in procedure; similar discretion in the choice of the bases of decisions is exercised by all courts every day in other types of litigation."

33. For a more extensive discussion of this point, see Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290 at 293, 294 (concurring opinion).

34. Emphasis added. See also Shakespeare Co. v. Perrine Manufacturing Co., 8 Cir., 91 F.2d 199.

firmed solely on the non-infringement issue, citing the Eighth Circuit decision in Kresge Co. v. Davies, supra, which adopted the so-called "better and wiser practice." But the concurring opinion in the Aero Spark Plug case analyzed and criticized that practice as injurious to the public. It pointed out that the patent there in suit was a "vicious zombi" whose continued existence would serve as a threat to the public interest. Thus that concurring opinion said that "An invalid patent masquerading as a valid one is a public menace," and went on as follows: *To allow a patent to remain apparently valid when* the issue of invalidity is raised and *the court sees that the patent is invalid,* is to ignore the paramount public interest. Because no representative of the public may institute a suit to have a patent held invalid,[35] and because the courts have no staff of independent experts to aid them in patent suits, the courts, must, in most cases, rely on the litigants in ascertaining the prior art. But, when, in a patent suit, *the court is aware of a prior art which shows no invention,* and that issue is raised by one of the parties, the public interest would seem to require that the court should so decide."[36] As this point was subsequently reiterated by us in Cover v. Schwartz, cited approvingly in Interchemical, I think it fair to say that this part of the concurring opinion in Aero Spark Plug illuminates the meaning of Interchemical.

After the Electric Fittings decision, and before the Interchemical decision, the Supreme Court, in Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450, citing Cover v. Schwartz, said: "To hold a patent valid if it is not infringed is to decide a hypothetical case." In Interchemical, as previously noted, the Supreme Court again cited Cover v. Schwartz as illustrating the "better practice." Yet, curiously, Judge CHASE relies on the Supreme Court's statement in the Interchemical case about the "better practice," to support his

view that, disregarding the Electrical Fittings case and Cover v. Schwartz, it is proper for a trial court to find a non-infringed patent valid.

My view of Interchemical—*i. e.,* that it merely admonishes that patents shown by the evidence to be "zombis" must be held invalid—was expressed by this court in Harries v. Air King Products Co., 2 Cir., 183 F.2d 158, 162. There, referring to the passage in the Interchemical case about the "better practice," this court said that it was "certainly not put in the form of a peremptory direction, but rather of a cautionary admonition, to be followed when that is the more convenient course; * * * We hold that it is open to a court to proceed as is most convenient, subject to the exception that, though the defendant has not infringed, *claims may be so evidently invalid that the court should so declare.*"[37] With that interpretation I wholly agree; for it regards as mandatory an exploration of the validity of a non-infringed patent where, but only where, the evidence shows that the patent is a "scarecrow."[38]

3. *Judge CHASE'S third argument,* i. e., *that Rule 52(a) often authorizes a trial court to disregard Electrical Fittings and to revert to the practice there condemned.*

Judge CHASE'S third argument, based on Rule 52(a), as I understand it runs as follows:

Where validity is contested, if the trial judge, upon finding the patent not infringed, dismisses for that reason, and makes no finding, one way or the other, about validity, then—unless the patent is "clearly invalid" (*i. e.,* a "scarecrow")[38a]—the upper court, because of Rule 52(a), may never decide that the patent is invalid; in such circumstances, the upper court must always postpone any such decision of its own until, by remanding the case, it has first obtained the trial judge's finding that the patent is either valid or invalid. Wherefore (so I understand Judge Chase), the

---

35. Except for fraud in procuring the patent. United States v. American Bell Telephone Co., 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144.

36. Emphasis added.

37. Emphasis added. See e. g., Airolite Co. v. Fiedler, 2 Cir., 147 F.2d 496, 499.

38. See Hale v. General Motors Corp., 1 Cir., 147 F.2d 383, 388.

38a. As in Airolite Co. v. Fiedler, supra, note 37.

trial court here acted correctly in finding valid the uninfringed patent, since he thereby obviated the necessity of remanding, should the upper court (if it regarded the patent as not a "scarecrow") wish to exercise its discretion to consider the patent's invalidity in addition to affirming for non-infringement.

I have several replies to this argument:

(1) It will be noted that it relies on Rule 52(a), not on Interchemical, to obliterate Electrical Fittings. If this argument is sound, Electrical Fittings was always wrong. For, although present Rule 52(a) was not in effect when the trial judge acted in Electrical Fittings, former Equity Rule 70½ was; and present Rule 52(a) is the equivalent of Equity Rule 70½.[39] The present Rule is not, then, a new factor which justifies a departure from Electrical Fittings.

(2) Judge CHASE'S third argument, if sound, would render improper our own current practice. Thus, recently, in Bilofsky v. Westinghouse Elec. Sup. Co., 2 Cir., 1947, 160 F.2d 154,[39a] this court (per Judge CHASE with Judge A. N. HAND and me concurring), after saying: "The trial court did not find any infringement and dismissed the complaint without passing upon the question of validity", went on to decide that the patent was invalid, without remanding for a trial court finding relative to validity—although, on the evidence, the patent was not a "scarecrow."[40]

I add that, in that case, on the evidence the patent was not a "scarecrow" because Judge CHASE now—in his opinion in the instant case—apparently says that only when a patent is thus obviously invalid may an appellate court pass on its invalidity without a previous trial court finding on that issue.[41] There I think Judge CHASE is in error. I think that the authority of an upper court to decide a patent's invalidity, without a trial court finding on that issue, has nothing whatever to do with whether or not the patent is or is not "clearly invalid." That authority depends not on the gross obviousness of the patent's invalidity but on the kind of evidence in the record before the upper court. Recent pertinent decisions of the Supreme Court emphasize the following distinction:

(a) If, on the issue of validity, there is substantial oral testimony of such a character that the credibility of orally testifying witnesses is crucial, then, under Rule 52(a), a trial court finding as to the facts bearing on that issue may be conclusive, because the trial judge saw and heard those witnesses and the upper court cannot.[42] In that situation, such a finding is therefore a necessary vestibule to an upper court decision as to invalidity. But in that type of case it cannot be said sweepingly (as I understand Judge CHASE to say) that the upper court may dispense with a trial court finding when the patent is obviously invalid. For, in this type of case, the existence of a fact demonstrating the patent's,

39. See Note of the Advisory Committee to F. R. C. P. 52(a); U. S. v. U. S. Gypsum Co., 333 U.S. 364, 394–395, 68 S. Ct. 525, 92 L.Ed. 746. Cf. District of Columbia v. Pace, 320 U.S. 698, 64 S.Ct. 406, 88 L.Ed. 408.

39a. See also Brunswick-Balke-Collender Co. v. American B. & B. Corp., 2 Cir., 150 F.2d 69, 70.

40. Judge CHASE seems to cite Helbush v. Finkle, 9 Cir., 170 F.2d 41, in support of his argument. Especially in the light of an earlier decision in the same Circuit—Marchus v. Druge. 9 Cir., 136 F.2d 602, 605—I doubt whether Helbush does lend such support. If it does, I think it wrong.

41. I so interpret the following statement by Judge CHASE: "Of course in those comparatively rare instances where the patent in suit is clearly invalid, and a trial court has failed to so hold, an appellate court may do so without any re-mand for findings for, by hypothesis, the record is already adequate to support such a decision. But, where invalidity was a substantial issue, and the complaint was dismissed for non-infringement without findings on the question of validity in compliance with Rule 52(a), F. R. C. P., on appeal the judgment has been vacated and the cause remanded for such findings. Helbush v. Finkle, 9 Cir., 170 F. 2d 41. I take that to mean that where the course followed below is not taken, in cases where validity presents a substantial question, it may be required in order that invalid claims be not left as a threat longer than necessary."

42. Graver Mfg. Co. v. Linde Mfg. Co., 336 U.S. 271, 275, 69 S.Ct. 535, 93 L.Ed. 672; Graver Mfg. Co. v. Linde Mfg. Co., 339 U.S. 605, 609–611, 70 S.Ct. 854, 94 L.Ed. 1097.

obvious invalidity may depend on the trial judge's belief in a witness' oral testimony concerning the existence of that fact. Unfortunately, in some such cases the alleged infringer fails to produce such a witness. So it was in Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721, where the court held the patent invalid. Not until, in the later case of Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049, where the defendant introduced further oral testimony, was the Court able to know that the patent was, so to speak, patently bad.

(b) But the Supreme Court has very recently said that a trial-court finding of validity may be disregarded by the upper courts where the "facts are little in dispute",[43] i. e., when the issue can be resolved solely by a consideration of undisputed documentary evidence and physical exhibits (or of such documentary evidence and exhibits which render the oral testimony insignificant or grossly incredible). For then, as in similar non-patent cases, the upper court is as well able as the trial court to decide that issue.[44] In such a case, a trial court finding on the validity issue is not a necessary prelude to an upper-court decision thereon.[45] In this second type of case, the upper court has authority to pass on validity, absent any trial-court finding thereon, even if the patent's invalidity is not strikingly apparent. To be sure, in this type of case, if the evidence shows the patent to be a "scarecrow," the upper court must hold it invalid, whether or not it also holds it uninfringed.[45a] But even if the evidence does not reveal the patent as a "scarecrow," the upper court, when the evidence warrants, has discretion to decide that the patent is invalid; that is, the court (if the evidence so justifies) may hold the patent merely invalid or merely uninfringed, or both valid and uninfringed.[46]

Rule 52(a) does not, then, in contradiction of Electrical Fittings, ever require or permit a trial judge to find that an uninfringed patent is valid.[47]

---

43. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 340 U.S. 147, 153–154, 71 S.Ct. 127, 131.

44. Seo U. S. v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Orvis v. Higgins, 2 Cir., 180 F.2d 537, 539; Luckenbach S. S. Co. v. U. S., 2 Cir., 157 F.2d 250, 251; Kind v. Clark, 2 Cir., 161 F.2d 36, 46; The Coastwise, 2 Cir., 68 F.2d 720, 721; Stokes v. U. S., 2 Cir., 144 F.2d 82, 85; Norment v. Stillwell, 2 Cir., 135 F.2d 132; Pfeifer Oil Trans. Co. v. The Ira S. Bushey, 2 Cir., 129 F.2d 606, 607; Equitable Life Assurance Society of U. S. v. Irelan, 9 Cir., 123 F.2d 462, 464; Bowles v. Beatrice Creamery Co., 10 Cir., 146 F.2d 774, 780; Dollar v. Land, D.C.Cir., 184 F.2d 245, 248–249; Lauricella v. U. S., 2 Cir., 185 F.2d 327, 328; Sawyer v. McDonald, 5 Cir., 165 F.2d 426, 428; Letcher County v. DeFoe, 6 Cir., 151 F.2d 987, 990.

The same may be the result when the oral testimony is virtually undisputed and abundantly corroborated by undisputed documentary evidence. Such, in effect, was the case in Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049—which therefore is really a case of the second type.

45. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 36, 50 S.Ct. 9, 74 L.Ed. 147; United States v. Esnault-Pelterie, 303 U. S. 26, 30–31, 58 S.Ct. 412, 82 L.Ed. 625; cf. Singer Mfg. Co. v. Cramer, 192 U.S. 265, 275, 24 S.Ct. 291, 48 L.Ed. 437; Altoona Theatres v. Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997. See also Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 802; Stuart Oxygen Co. v. Josephian, 9 Cir., 162 F.2d 857, 859; Fleming v. Palmer, 1 Cir., 123 F. 2d 749, 751; Pennington Engineering Co. v. Spicer Mfg. Corp., 6 Cir., 165 F.2d 59; cf. Hazeltine Research v. General Motors Corp., 6 Cir., 170 F.2d 6, 10.

45a. As in Airolite Co. v. Fiedler, 2 Cir., 147 F.2d 496, 499, supra, notes 37 and 38a.

46. In a proper case of this second type, the court, without a trial court finding as to validity, may hold the patent valid and infringed.

47. Nor does Rule 52(a) require a remand for a finding as to validity except in these two instances:

(a) Suppose that the trial judge, finding a patent uninfringed, dismisses the suit without a finding about validity. Suppose the upper court believes that the non-infringement finding is wrong. If the case is of the first type—i.e., where oral testimony on the validity issue is crucial—the upper court, before it decides the case, must remand for a trial-court finding on that issue. (I think the upper

The instant case is of the second type— i. e., the oral testimony is not crucial—so that here we are not bound by the trial judge's findings. If, then, from the evidence, we had concluded that the three claims of the process patent were valid and infringed, we could properly have so decided without remanding, although the trial judge found those claims not infringed. Since the claims are not "scarecrows," and since we agree with the trial judge that they are uninfringed, we may in our discretion do as we have done here, i. e., affirm as to non-infringement without considering invalidity. But, because of Electrical Fittings, we may not properly allow the judge's finding of validity to stand but must direct its deletion.

(I should add that my discussion of trial-judge fact-finding in the two types of cases is oversimplified because it does not take into account the difference in the first type of case between (a) what may be called the trial judge's "primary" inferences drawn from witnesses' statements of fact and (b) what may be called the trial judge's "secondary" inferences drawn from his "primary" inferences. For a discussion of that difference, see the Appendix to this opinion, points I and II.)

## Conclusion

I return to what I said at the outset. As I see it, the Supreme Court has developed these two distinct and entirely compatible policy considerations in patent litigation:

(a) To protect the public, patents that are obviously "scarecrows" or "zombis" should be held invalid, when possible.[48]

(b) In order to protect not only the defendants but also—in the public interest—others who may later be sued for infringement or threatened with infringement suits, a court should never find or state that a non-infringed patent is valid.

Judge CHASE has, I think, misinterpreted (a) and so broadened it as to render (b) impotent. If his view is adopted we will have a recurrence (as here) of the very practice disapproved in the Electrical Fittings case, i. e., that of making judicial statements, in the form of advisory opinions, that patents are valid though not infringed. This practice, I repeat, is undesirable (1) not merely because it may leave the defendant in such a case in a position where the defeated patent-owner may thereafter assert that he has an adjudication of validity as against that defendant, but (2) also because the defeated patent-owner will be able to misuse the judicial statement of validity in later litigation, or threatened litigation, against other alleged infringers, with resultant injury to the public interest.

In sum, I think we should (1) express disagreement with some of Judge CHASE'S dicta[49] in the quoted passage of his opinion,[50] and (2) direct the district court to strike out the finding that the three

court should state its reason for remanding, i.e., that, if the patent is valid, the upper court is ready to hold it infringed.) If the trial judge, on the remand, finds the patent valid, and if the upper court accepts that finding, it will hold the patent valid and infringed.

I say "if the upper court accepts that finding," for this reason: Even where oral testimony is crucial, the trial judge's finding binds the upper court only in so far as it involves the trial judge's "testimonial inference"—his inference that a fact exists because he believes a witness who testified to the existence of that fact. The trial judge's "secondary inferences" do not similarly bind the upper court. See the Appendix to this opinion, points I and II.

(b) Again, suppose the trial judge dismissed for uninfringement solely, but the

upper court wants to hold the patent invalid (or both invalid and uninfringed). If the case is of the first type, the upper court must remand for a finding on the issue of validity, admonishing the trial judge to make no finding unless he finds the patent invalid.

48. The third circuit has held it important to wipe out such a patent even where the defendant (the alleged infringer) has not contested its validity. Cridlebaugh v. Rudolph, 3 Cir., 131 F.2d 795, 800, citing Densmore v. Scofield, 102 U.S. 375, 378, 26 L.Ed. 214. See also Slawson v. Grand St. R. Co., 107 U.S. 649, 652, 2 S.Ct. 663, 27 L.Ed. 576; Brown v. Piper, 91 U.S. 37, 44, 23 L.Ed. 200.

49. See point III of the Appendix to this opinion.

50. See footnote 1.

non-infringed claims of the process patent are valid.

## Appendix

### I. Inferences in Trial-Judge Fact-Finding Generally

In determining the facts of a case, often many inferences are required. Some inferences made by the trial judge are impregnable; others are not:

(1) When a witness testifies to the existence or occurrence of a fact, if that testimony is accepted as true (i. e., credible, reliable), then it is inferred from his assertion of the existence or occurrence of that fact that such a fact existed or occurred. The inference is that the witness correctly stated that fact. Wigmore has termed this a "testimonial inference"; it may also be called a "primary inference." (In passing, it may be noted that a witness usually arrived at the statements of fact in his testimony by his inferences from his observations; as Wigmore says, the "element of inference from observed data is one which plays a greater or less part in every witness' testimony. * * * ")

If the trial judge makes a "testimonial" or "primary" inference, but if he did not observe the witness while he testified, the upper court is not bound by that inference, but may make its own (i. e., it may infer that the witness' testimony is or is not reliable).

If, however, the witness testified orally (i. e., in the trial judge's presence) then the trial judge's "testimonial" or "primary" inference must usually be accepted by the upper court. That is the usual rule because of the importance attached to witnesses' demeanor in estimating credibility; the demeanor is regarded as a sort of "real evidence." Absent documentary evidence—or undisputed facts, or gross improbability, or "laws of nature"—which render highly dubious the trial judge's choice of some parts of the testimony as credible, his discretion in making "testimonial" or "primary" inferences is virtually unreviewable.[51] Accordingly, this discretion has been called his "sovereignty." See, e. g.,

Broadcast Music Co. v. Havana Madrid Restaurant Co., 2 Cir., 175 F.2d 77; Orvis v. Higgins, 2 Cir., 180 F.2d 537. In such a case, says Stephen, the trial judge's "task is to infer, from what he * * * sees and hears, the existence of facts which he neither sees nor hears."

Of course, documents do not prove themselves; oral testimony (absent a stipulation or waiver) is necessary to establish their authenticity (or the like). See e. g., Corbin, The Parol Evidence Rule, 53 Yale L. J. 603. The trial judge's "testimonial inferences" affecting such an issue have the dignity accorded to other such inferences.

(2) From a fact or facts ascertained—by "testimonial" or "primary" inferences—from testimony, another fact or other facts, concerning which no one has testifed, may be inferred. Any such inference may be labelled a "secondary inference." That is, some facts, as to which there is no testimony are inferred by reasoning from a fact or facts previously ascertained by "testimonial" or "primary" inferences from the testimony. The trial judge's task, says Stephen, "is to infer (1) from what he himself hears and sees the existence of facts asserted [by witnesses] to exist; (2) from the facts which, on the strength of such assertion, he believes to exist, other facts which are not so asserted [by witnesses] to exist."

For example, a witness testifies that, on December 1, 1950, someone, at the point of a gun, forcibly took a diamond ring from the witness; the trial judge infers that that is a fact. Another witness testifies that, on December 2, 1950, he saw that diamond ring on the defendant's finger; the trial judge infers that that is a fact. Reasoning from those two inferred facts (each of which was reached by a "testimonial" inference), the trial judge infers that the defendant either stole the ring or received it from the thief. This latter is a "secondary" inference of a fact which no witness has asserted.

Even if the trial judge's "testimonial" in-

---

51. The same may be true of his "primary" inferences from other sorts of "real" evidence (including a "view").

602

ferences stem from oral testimony and therefore bind the upper court, still his "secondary" inferences are not similarly binding, for those "secondary" inferences involve no use of demeanor-observation. So, if he "finds" a fact by means of a purported "secondary" inference, an upper court may—and should—reject that finding if the trial judge's "secondary" inference was not rational (*i. e.,* if no reasonable man would thus infer). The upper court then accepts the trial judge's "testimonial" inference (if grounded upon oral testimony not excessively incredible) but substitutes its own "secondary" inference.

Sometimes any one of several alternative rational "secondary" inferences is possible. If so, then, even if the trial judge's "secondary" inference was rational, the upper court may—but need not—substitute its own rational "secondary" inference. For then (regardless of whether the trial judge's "testimonial" inferences are binding), the upper court is in as good a position as the trial judge to draw a "secondary" inference from the trial judge's "testimonial" inferences.

Thus Judge Learned Hand (referring to the demeanor of orally testifying witnesses as "evanescent factors," because they are not incorporated in the record which comes to the upper court) said of a question of "intent," in E. F. Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679, 684: "When an appellate court is faced with that question, it is in substantially as good a position to answer it as the trial judge, provided it accepts as true all the oral testimony as we do here, so far as it was relevant. We yield to findings of fact, so far as those parts of the evidence which cannot come before us may have controlled their decision; we must assume that these evanescent factors may have been persuasive, unless what does come before us rationally forbids the conclusions, no matter what the unknown factors were. After giving them every possible probative force they might have, our problem therefore becomes the

same as that before the trial court." See also District of Columbia v. Pace, 320 U. S. 698, 701–702, 64 S.Ct. 406, 88 L.Ed. 408.

(3) Sometimes the so-called "ultimate" facts may be directly inferred from the facts ascertained by "secondary" inferences. Sometimes, however, there is need to ascertain intermediately—by further inferences from the facts reached by "secondary" inferences—so-called "constitutive" or "pivotal" facts, from which, in turn, the "ultimate" facts are inferred. With respect to any of these inferences—mentioned in this paragraph (3)—made by the trial judge, the upper court's power is the same as that described in (2) supra.

The foregoing comments are not, at least in the federal courts, fully applicable to jury verdicts or to the findings of most administrative agencies.[19] See United States v. U. S. Gypsum Co., 333 U.S. 364, 394–396, 68 S.Ct. 525, 92 L.Ed. 746; Orvis v. Higgins, 2 Cir., 180 F.2d 537. It may be doubted, however, whether jury verdicts in patent cases possess any special dignity with reference to many basic issues.

As to all the foregoing, see, e. g.,—in addition to the cases cited above and in point 3 of the main body of this opinion—Daitz Flying Corp. v. U. S., 2 Cir., 167 F.2d 369, 371; U. S. v. Anderson Co., 7 Cir., 119 F. 2d 343, 346; U. S. v. South Georgia Ry. Co., 5 Cir., 107 F.2d 3; J. S. Tyree Chemist v. Thymo Borine Laboratory, 7 Cir., 151 F. 2d 621, 624; Mid-Continent Investment Co. v. Mercoid Corp., 7 Cir., 133 F.2d 803, 809, reversed on other grounds, 320 U. S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857; Bach v. Friden Calculating Mach. Co., 6 Cir., 155 F.2d 361, 364; Barbarino v. Stanhope S. S. Co., 2 Cir., 151 F.2d 553, 555; Kreste v. United States, 2 Cir., 158 F.2d 575, 577; Consolidated Water P. & P. Co. v. Spartan A. Co., 3 Cir., 185 F.2d 947, 951; cf. Standard Oil Development Co. v. Marzall, 86 U.S.App.D.C. 210, 181 F.2d 280, 282–284; Evergreens

---

52. For instance, the actual or imputed "secondary" inferences of a jury will not be disturbed if rational, although other rational "secondary" inferences are possible. Much the same is true of the "secondary" inferences of most federal administrative agencies. See Stern, Review of Findings, 58 Harvard Law Review, 1944, 70, 80–81, 84–86, 89.

v. Nunan, 2 Cir., 141 F.2d 927, 928, 152 A.L.R. 1187.

See also Stephen, The Principles of Judicial Evidence, published as an Introduction to the Indian Evidence Act (1872); Wigmore, The Principles of Judicial Proof (2d ed. 1931); Gulson, The Philosophy of Proof (2d ed. 1923).

## II. Inferences in Trial-Judge Fact-Finding in Patent Litigation

Except as to subject matter, a trial judge's fact-finding in patent litigation has no unique characteristics. The learning as to such fact-finding in general therefore applies to patent suits in particular. This, then, would seem to follow:

(a) In many patent suits, the evidence consists of documentary evidence (i. e., the patent in suit and other documents disclosing the prior art), physical exhibits, and oral testimony of experts. Suppose that such an expert orally testifies that the patented device, or some device disclosed in the prior art, does or does not achieve a certain result. Suppose that the trial judge, believing that witness, makes a "testimonial inference," i. e., he infers that the fact asserted by that witness is a fact; that the trial judge then finds it to be a fact; and that that finding is not irrational or incredible in the face of the undisputed non-oral evidence. Such a finding binds the upper court, because it involves an estimate of the credibility of a witness whom the trial judge saw and heard but whom the upper court cannot see or hear. If the validity or invalidity of the patent is the sole rational inference from that finding, the upper court must decide the validity issue accordingly, if, in a proper case, it passes on that issue. If the findings (supported by the evidence) show that the patent is a "scarecrow," the upper court must always so hold. If they do not, the upper court may, in its discretion, disregard the validity issue,[53] should it decide that the patent is not infringed; but, again, as to the infringement issue, the upper court is bound by the trial judge's findings of fact, if they are of the kind above described.

However, although the upper court must accept such a finding, it may nevertheless decide the issue of validity or infringement differently from the trial judge, provided the upper court's decision rests upon rational inferences ("secondary" inferences) derived from the trial judge's finding based on his "testimonial" inferences. For the upper court is in as good a position to draw such "secondary inferences" from the "testimonial inferences" as was the trial judge, since those "secondary" inferences do not require any evaluation of the credibility of a witness seen and heard by the trial judge.

Yet, because, in a patent case of that sort, the trial judge's "testimonial" inferences derive in part from observation of a witness' demeanor, the trial judge's finding of fact is, to that extent, an indispensable condition precedent of the upper court's decision (one way or another) of the validity or infringement issue.

(b) In many patent suits, however, the oral testimony of the experts adds nothing of substance to the undisputed non-oral evidence, or is so much at variance with that evidence as to be unworthy of credit, or has an expository value not dependent on an estimate of credibility. In order to understand the case, it may be necessary (as in many suits not relating to patents) to study carefully an intricate art or science, and the exposition by some of the expert witnesses may be most helpful in that respect; yet a reading of the printed record of that testimony in such a suit will often be as helpful as—perhaps more helpful than—listening to an oral statement to the same effect (for most men are eye-minded rather than ear-minded). In any such suit, the upper court is as well able to ascertain the facts as the trial judge, since there are no essential "testimonial" inferences to be drawn from oral testimony; consequently, any finding he makes does not bind the upper court; and therefore a finding by the trial judge does not constitute a necessary prelude to the upper court's decision of validity or invalidity (or infringement or non-infringement). In such a suit, when the trial court has

53. Unless the non-testimonial evidence demonstrates the patent's obvious invalidity.

merely held the patent not infringed, the upper court may properly hold it valid and infringed; or the upper court may hold it not infringed, or invalid, or both. Only if, on the evidence, the patent is a "scarecrow," is the upper court required to hold the patent invalid, whether or not the upper court also holds the patent to be not infringed. But the upper court's authority as to fact-finding in a case of this type does not turn on whether, on the evidence, the patent is or is not a "scarecrow."

### III. The Difference Between (A) Coupling Findings of Invalidity and Non-Infringement and (B) Coupling Findings of Validity and Non-Infringement

Judge Learned Hand intimated, by way of dictum, in Harries v. Air King Products Co., 2 Cir., 183 F.2d 158, that, perhaps where a patent is held not infringed, an accompanying finding of its invalidity is as improper as an accompanying finding of its validity, and should be deleted. Such an intimation ignores the distinction we made in Cover v. Schwartz, 2 Cir., 133 F.2d 541, and contradicts what Judge Learned Hand, in Larson v. General Motors Corp., 2 Cir., 134 F.2d 450, 453, himself said in explaining what had been decided in Cover v. Schwartz: "We agreed that the judge might have decided on both grounds * * * " i. e., invalidity and non-infringement. It also ignores what this court said in Addressograph-Multigraph v. Cooper, 2 Cir., 156 F.2d 483, 485. There, after citing Cover v. Schwartz and quoting Altvater v. Freeman to the effect that, "To hold a patent valid if it is not infringed is to decide a hypothetical case", this court said (per Judge Woodbury)[54] that "it does not follow that to hold a patent invalid if it is not infringed, is also to decide a hypothetical case. See Hale v. General Motors Corp., 1 Cir., 147 F.2d 383, 388;

Grant Paper Box Co. v. Russell Box Co., 1 Cir., 151 F.2d 886, 890; Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644. The reason for this is the importance to the public generally that an invalid patent 'should not remain in the art as a scarecrow.' "

The dictum in the Harries case also comments that, in Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644, the infringement issue "of course become moot upon the finding of invalidity."[55] The Supreme Court did not so hold or even intimate. On the contrary, the district court, having there found both invalidity and non-infringement, the Supreme Court said (citing Cover v. Schwartz) that the district court had followed the "better practice." True, the Supreme Court affirmed on the ground of invalidity alone; but there is not a line in the Supreme Court's opinion indicating that it refrained from deciding the infringement issue because it was moot. The Court so refrained, I think, in the exercise of its discretion.

It has been suggested (not by Judge Learned Hand or Judge CHASE) that Altvater v. Freeman, 319 U.S. 359, 63 S. Ct. 1115, 87 L.Ed. 1450, is basically inconsistent with the rationale of Cover v. Schwartz. The suggestion is that, in Altvater, the Court decided that a trial court, even if it holds a patent non-infringed, may yet hold it valid, if only the alleged infringer, by way of a counterclaim, has prayed a declaratory judgment of invalidity.[56] That suggestion, I think, rests on a misreading of the Altvater case. There the trial court dismissed the patent-owner's complaint, on the ground of non-infringement; but it granted the prayer of defendant's declaratory-judgment counterclaim

---

54. Note that in the Harries case, this court cited approvingly Judge Woodbury's previous remarks in Grant Paper Box Co. v. Russell Box Co., 1 Cir., 151 F.2d 886, 890. There he said, for the court, that " * * * sometimes, even when a patent is not infringed, it is proper to go further and in the public interest to declare a patent invalid if in discretion

the circumstances presented make such a course seem appropriate."

55. See a related comment in Richard Irvin & Co. v. Westinghouse Air Brake Co., 2 Cir., 121 F.2d 429, 430, decided before Cover v. Schwartz.

56. See dissenting opinion in Addressograph-Multigraph Corp. v. Cooper, 2 Cir., 156 F.2d 483, 486, 487.

(which raised broader issues as to validity than did plaintiff's complaint) and held the patent claims invalid. The Court of Appeals affirmed as to non-infringement but (purporting to follow the Electrical Fittings case) directed the modification of the decree so far as it held the patent claims invalid.[57] The Supreme Court reversed the Court of Appeals. Citing Cover v. Schwartz, supra, the Supreme Court said, "To hold a patent valid if it is not infringed is to decide a hypothetical case." But, said the Supreme Court, the issue raised by the counterclaim concerning validity went far beyond that raised by the complaint.[58] Moreover, the trial court in Altvater did not decide that a non-infringed patent was valid; it decided that a non-infringed patent was *invalid*. Such a decision this court in Cover v. Schwartz, supra, had said was proper. The same has been said in subsequent cases, citing Altvater and Cover v. Schwartz, by this court and other courts.[59] Neglect of this distinction (a neglect stemming from a misinterpretation of the Electrical Fittings case) led to the erroneous decision of the Court of Appeals in the Altvater case, supra, which the Supreme Court reversed.[60]

57. See 8 Cir., 130 F.2d 763.

58. Cf. Kalo Inoculant Co. v. Funk Bros. Co., 7 Cir., 161 F.2d 981, 990–991, reversed on other grounds, Funk Bros. Co. v. Kalo Inoculant Co., 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588.

59. See, e.g., Addressograph-Multigraph Corp. v. Cooper, 2 Cir., 156 F.2d 483, 485; Grant Paper Box Co. v. Russell, 1 Cir., 151 F.2d 886, 890, modified, on rehearing, for other reasons, 1 Cir., 154 F.2d 729.

60. See Altvater v. Freeman, 319 U.S. at 363, 63 S.Ct. 1115, 87 L.Ed. 1450.